STATE OF CONNECTICUT *v.* JAMES JORDAN
(AC 32157)

DiPentima, C. J., and Alvord and Bishop, Js.

---

[1] The original complaint named eleven defendants. Melville is the only defendant relevant to this appeal.

Argued October 11, 2011—officially released January 10, 2012

*Cameron Dorman*, special public defender, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Maureen Ornousky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, James Jordan, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree as an accessory in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8 (a), and, after a trial to the court, of criminal possession of a firearm in violation of General Statutes § 53a-217. On appeal, the defendant claims that (1) the trial court improperly permitted the state to amend the information after the trial had commenced[1] and (2) the prosecutor made remarks during direct examination and closing argument that were so improper that they

---

[1] The state amended the information twice after trial had commenced. The defendant does not challenge the first amendment to the information, in which the state modified the charge from conspiracy to commit assault in the first degree under General Statutes § 53a-59 (a) (1) to three counts of assault in the first degree as an accessory under §§ 53a-59 (a) (3) and 53a-8 (a). Section 53a-59 (a) (3) requires the state to prove beyond a reasonable doubt that the defendant "under circumstances evincing an extreme indifference to human life . . . recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ." The state's second amendment of the information charged the defendant as an accessory under § 53a-59 (a) (5). Section 53a-59 (a) (5) requires that the state prove beyond a reasonable doubt that "with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

served to deprive the defendant of a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. A fight broke out on the evening of July 19, 2008, at Harry O's, a "strip club" in Stamford located at the intersection of Selleck Street and Vassar Avenue. Courtney Green, a stocky male with dreadlocks, accused Jonathan Payano of attempting to pick his pocket. Payano responded with a racial slur which led Green to punch him in the face. As James Dunaway, a bouncer, attempted to break up the altercation, Payano threw a beer bottle. Dunaway and Steve McDow, a bar employee, grabbed Payano and physically removed him from the club, telling him to leave the premises. The bouncers and the manager, Loren Lane, refused to allow Green to exit the club in an attempt to avoid any further violence between the two men. Payano's friends, Harvey Castro and Arismendy Rayanoso, along with Payano's cousin, Michael Garribido, witnessed Payano being thrown out of the club and went outside to find out what had happened. The four men were upset that Payano had been thrown out of the club when it had been Green who had thrown the first punch. Instead of leaving the premises as instructed, the men waited in the parking lot and made several attempts to talk to the bouncers about the situation, which they believed had been handled unfairly. At one point, Rayanoso attempted to sneak back into Harry O's but, upon entering, was immediately ejected by the bouncers.

After Green was prevented from leaving by the Harry O's bouncers, he placed a call on his cell phone and paced back and forth inside the club. He was overheard saying into the phone that he "needed some help and there was some guys out there that's going to do me." Green then left Harry O's via an emergency door that led to Selleck Street. McDow saw that the door had been left ajar and went to close it. As McDow approached the

door to close it, he saw Green standing with another man later identified as the defendant, whom he described as a short, medium built, slender black man with dreadlocks wearing a blue Yankees cap. McDow testified that Green and the man were "close enough to kiss."

Meanwhile, Rayanoso walked around the side of Harry O's toward the Selleck Street emergency door in another attempt to reenter the club. Before he could fully approach the door, he saw Green and the defendant. Rayanoso watched as the defendant passed an object to Green. Rayanoso began walking back towards the Harry O's parking lot where his friends were waiting. He heard Green say, "There's one of the guys." Thereafter, Rayanoso hid behind a car in the parking lot and watched in shock as Green and the defendant strode towards Payano, Garribido, and Castro. The defendant walked in front of Green, who held one hand behind his back, as they approached Payano, Castro, and Garribido. As Green and the defendant came closer to the group, Green said words to the effect of "who wants trouble?" He pushed the defendant out of the way and pulled a .38 caliber gun with a long barrel from behind his back, shooting at the three men from only a few feet away. Payano, Garribido, and Castro were all shot. Green tossed the gun to the defendant and the two men fled, running away from the scene in different directions.

In the following days, the Stamford police focused their search on the area immediately surrounding Harry O's because of the short amount of time between when Green made the call on his cell phone inside the club and when his friend arrived with the gun. The police picked up the defendant, who matched the description provided by witnesses, including wearing a blue Yankees cap on his head, in a housing complex within short walking distance of the club. Upon being questioned,

the defendant admitted that Green was an acquaintance of his from jail and that Green had called him twice on the night of the shootings. Green first called the defendant around 9:45 p.m. to ask him to go out to clubs with him, but the defendant declined Green's invitation because he did not like to go to clubs. Green called the defendant a second time around 11 p.m. asking him to come to Harry O's because "something popped off at the strip club." The defendant told the police that he never went to meet Green because he was baby-sitting at the time. He denied any involvement in the shootings.

McDow, Rayanoso and Payano all subsequently selected the defendant's photograph out of photographic arrays and identified him in court as the person who assisted Green with the shootings. The defendant was arrested and held on bond at the MacDougall-Walker Correctional Institution. While he was housed there, the defendant wrote a letter to his sister, Belinda Jordan, in which he attempted to coach her on how to answer questions from the police about his whereabouts on the night of the shootings.[2] The letter was intercepted by a correction officer.

The three counts of assault in the first degree as an accessory were tried to a jury and the defendant elected a bench trial for the criminal possession of a firearm

[2] The defendant wrote the following:

"Black Azz:

"I'm bout to remind you of the night of *7-19-08* the shooting it been a little over a year so I know you don't remember. They going to ask you were was you on the night of *7-19-08*. All you have to say is *I remember going to go pick up my sister that night because we was going out,* so were was the defendant? (which is me) *well I did not go in the house because my sister was ready her and my brother was in the door way when I pull up I ask him were is ZY and he said laying down.* At what time was this? You say *"LIKE"* at *10:00 pm 10:15 pm* that's all you have to remember all the rest of the question's is irrelevant. Just if you don't know something always answer in *I believe so* or I'm *not sure.* Just remember the time date and that I was baby sittin and I'll see you soon. ONE" (Emphasis in original.)

charge. On October 20, 2009, the jury convicted the defendant on the three counts and the court found him guilty of the additional charge. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly permitted the state to amend the information after the trial had commenced because the state failed to offer good cause for the amendment as required by Practice Book § 36-18 and because allowing the state to amend the information after the state had all but rested its case prejudiced the substantive rights of the defendant under *State* v. *Tanzella,* 226 Conn. 601, 614–15, 628 A.2d 973 (1993). While we conclude that the state did not meet its burden to show good cause for amending the information, there was no prejudice to the defendant's substantive rights, and therefore any error by the court in permitting the state to amend the information was harmless.

"Before a trial begins, the state has broad authority to amend an information pursuant to Practice Book § 36-17. Once the trial has started, however, the prosecutor is constrained by the provisions of Practice Book § 36-18. This court has held that for purposes of Practice Book §§ 36-17 and 36-18, a criminal trial begins with the voir dire of the prospective jurors. *State* v. *Phillips,* 67 Conn. App. 535, 539, 787 A.2d 616 (2002).

"Under Practice Book § 36-18, if good cause is shown, the court may permit the state to amend the information at any time before a verdict is returned. The sole limiting requirement under Practice Book § 36-18 is that no additional or different offense may be charged in an amendment, and no substantive rights of the defendant may be prejudiced by an amendment. . . . *State* v. *Phillips,* supra, 67 Conn. App. 539; see also Practice Book § 36-18. . . .

"If the state seeks to amend charges after the commencement of trial, it shoulders the burden of establishing that no substantive rights of the defendant would be prejudiced. . . . Like any other party petitioning the court, the state must demonstrate the basis for its request. Under [Practice Book § 36-18], the state must show: (1) good cause for the amendment; (2) that no additional or different offense is charged; and (3) that no substantive right of the defendant will be prejudiced. This allocation of burden encourages the state to prepare its case carefully because it bears the burden of justifying subsequent adjustments. *State* v. *Tanzella*, [supra, 226 Conn. 614–15]; *State* v. *Rodriguez*, 69 Conn. App. 779, 795, 796 A.2d 611, cert. denied, 260 Conn. 938, 802 A.2d 91 (2002)." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilson F.*, 77 Conn. App. 405, 411–13, 823 A.2d 406, cert. denied, 265 Conn. 905, 831 A.2d 254 (2003). We examine the defendant's claims regarding the first and third prongs of the test in *Tanzella* in turn, but need not address the second prong because the defendant does not claim that the court improperly allowed an amendment to the information charging the defendant with an "additional or different" offense. See *State* v. *Tanzella*, supra, 614–15.

## A

We first examine the defendant's claim that the state did not show good cause for amending the information after the commencement of the trial.[3] The defendant claims that the state offered only a bare assertion that case law allows the state to amend the information to conform to the evidence and that the state offered no reason why the actual evidence and testimony differed

[3] The defendant did not object to the amendment on the basis of good cause at trial; however, we conclude that the finding of good cause is implicit in the court's decision to allow the second substitute information and, therefore, review his claim. *State* v. *Phillips*, supra, 67 Conn. App. 539 n.7.

from the anticipated evidence and testimony. We agree with the defendant.

To meet its burden of showing good cause to amend an information pursuant to the rules of practice, the state must provide more than a bare assertion that it is merely conforming the charge to the evidence. See, e.g., *State* v. *Grant*, 83 Conn. App. 90, 93–95, 98, 848 A.2d 549, cert. denied, 270 Conn. 913, 853 A.2d 529 (2004); *State* v. *Wilson F.*, supra, 77 Conn. App. 413. In the present case, the prosecutor argued that the holding in *Tanzella* provides prosecutors with blanket authority to amend the information to conform to the evidence any time after the trial has commenced up until the point when the case is sent to the jury. We reject this interpretation of the holding of *Tanzella*, which would obviate the rule of practice requiring good cause to be shown. Here, the state argued that the information should be amended to conform to the testimony of the emergency room physicians who treated the three shooting victims and who were presumably relying on medical records to refresh their memories. Cf. *State* v. *Grant*, supra, 93–95, 98; *State* v. *Wilson F.*, supra, 413. According to the state, the court appropriately accepted the amendment to the information because the medical evidence demonstrated that the shootings caused physical injury rather than serious physical injury. The state failed to make any proffer as to *why* the testimony of the physicians was different than anticipated. Although there may have been good cause to amend the information a second time, the state failed to meet its burden to so prove.

B

The defendant claims that his substantive rights were prejudiced when the court granted the state's motion to amend the information after the commencement of the trial. We are not persuaded.

"As this court has noted, the improper amendment of the information implicates the defendant's constitutional right to fair notice of the charges against him . . . [and, consequently] the state must prove such error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Ramirez*, 94 Conn. App. 812, 819, 894 A.2d 1032, cert. denied, 278 Conn. 915, 899 A.2d 621 (2006).

"We believe that our Supreme Court was clear in *Tanzella* and that the burden clearly rests with the state at trial to demonstrate that the defendant's substantive rights are not prejudiced. . . . On *appeal*, the defendant must provide a specific showing of prejudice in order to establish that he was denied the right of due process of law as a result of the state's [amendment of] the information." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Wilson F.*, supra, 77 Conn. App. 413 n.6.

The defendant claims that he was deprived of the ability to effectively cross-examine witnesses because the state's amendment from first degree assault as an accessory under § 53a-59 (a) (3) to assault in the first degree as an accessory under § 53a-59 (a) (5) added the use of a firearm element. The defendant argues that adding the firearm element at such a late stage in the proceeding deprived him of the right to a searching cross-examination of the state's witnesses who by that point in the trial had completed their testimony. Although counsel could have recalled the witnesses and subjected them to further cross-examination regarding the firearm, the defendant argues that doing so would have drawn the attention of the jury to the use of the weapon, resulting in unfair prejudice.

The defendant's arguments might have been persuasive had the focus of his defense not been mistaken identity. "The defense theory, therefore, was not related

to the elements of the crime as originally charged or as amended. As a result, the amendment did not prejudice the defense because the effect of the amendment was logically distinct from the defense asserted. . . .

"Furthermore, nothing in the record indicates either that the defendant would have presented a different defense if the state had amended the information earlier in the proceedings or that he suffered unfair surprise as a result of the late amendment, which deprived him of a substantive right." (Citation omitted.) *State* v. *Ramirez*, supra, 94 Conn. App. 820. There was no dispute in this trial regarding whether the shootings occurred or whether someone assisted Green in committing the shootings. The defendant claimed simply that he was not the person who had helped Green. There was no issue as to whether a gun was used to commit the crime and, in fact, the court was trying the defendant on a criminal possession of a firearm charge simultaneously with the jury trial for the assault charges. The defendant cannot meet his burden of proving that he suffered prejudice to his substantive rights. We, therefore, conclude that the state's late amendment of the information was harmless beyond a reasonable doubt.

## II

The defendant next claims that the prosecutor made a series of improper remarks both during the trial and in closing argument, which were so grossly egregious that they served to deprive the defendant of his constitutional right to a fair trial. We disagree.[4]

---

[4] Although the defendant has not preserved, by way of objections or motions for mistrial, the claims of misconduct that he now raises on appeal, our Supreme Court has held that a defendant who fails to preserve claims of prosecutorial misconduct need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See *State* v. *Warholic*, 278 Conn. 354, 360, 897 A.2d 569 (2006). "The consideration of the fairness of the entire trial through the [*State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] factors duplicates, and, thus makes superfluous, a separate application of the *Golding* test. . . . This does not mean, however, that the absence of an objection at trial does not play a

"Prosecutorial [impropriety] claims invoke a two step analysis. First, the reviewing court must determine whether the challenged conduct did, in fact, constitute [an impropriety]. Second, if [an impropriety] occurred, the reviewing court must then determine if the defendant has demonstrated substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Miller*, 128 Conn. App. 528, 534–35, 16 A.3d 1272, cert. denied, 301 Conn. 924, 22 A.3d 1279 (2011).

"Prosecutorial misconduct may occur in the course of [the examination] of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the [examination] either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. . . .

"Prosecutorial misconduct may also occur in the course of closing argument. . . . Such argument may be, in light of all of the facts and circumstances, so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 538–39, 529 A.2d 653 (1987).

"In determining whether such [an impropriety] has occurred, the reviewing court must give due deference

significant role in the application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Warholic*, supra, 361.

to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Gilbert I.*, 106 Conn. App. 793, 800, 944 A.2d 353, cert. denied, 287 Conn. 913, 950 A.2d 1289 (2008); see also *State* v. *D'Haity*, 99 Conn. App. 375, 384, 914 A.2d 570, cert. denied, 282 Conn. 912, 924 A.2d 137 (2007).

## A

The defendant claims that the prosecutor committed improprieties by expressing an opinion on the credibility of a witness during direct examination, referencing facts not in evidence during closing argument, and injecting an extraneous issue into her rebuttal argument. We examine each claim of impropriety in turn.

## 1

### Expressing an Opinion on the Credibility of a Witness

The defendant first claims that the prosecutor improperly expressed an opinion on the credibility of a witness when she commented to the state's witness, Rayanoso, on direct examination that he had a very good memory.[5] We disagree.

[5] Although he speaks English, Rayanoso felt more comfortable testifying in his native Spanish and therefore required the assistance of an interpreter. The following colloquy took place:

"[The Prosecutor]: Michael drove you there?

"[The Witness]: Michael drove there.

"[The Prosecutor]: When you got there and you went into the place, what was the first thing that you recall happening?

"[The Witness]: We went to the bathroom.

"[The Prosecutor]: And then what?

"[The Witness]: They had—

"It is well established that a prosecutor may not express her own opinion, either directly or indirectly, as to the credibility of a witness or the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . A prosecutor's voucher for a witness is particularly dangerous for two reasons. First, such comments may convey the impression that the prosecutor is aware of evidence supporting charges against the defendant of which the jury has no knowledge. . . . Second, the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 304–305, 755 A.2d 868 (2000). "When reviewing a claim of prosecutorial impropriety, [however] we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 45, 917 A.2d 978 (2007).

After a careful review of the transcript, we conclude that the prosecutor's comment, in context, could not have been intended to bolster the credibility of the witness and, therefore, was not improper. The prosecutor clearly was attempting to elicit information as to the beginning of the altercation between Green and Rayanoso's friend, Payano, which culminated in the

---

"[The Prosecutor]: You have a very good memory.

"[The Witness]: Michael went to the bar; then me and Harvey and Jonathan, we was talking to some girls; and then Jonathan, he move away a couple inches from us. Then one guy told Jonathan that he was trying to robbing him; then everything started over there, so the bouncer kicked Jonathan out of the bar; then I went to Jonathan and then I'm trying to get back to the bar."

shootings. Instead, Rayanoso, who had just begun testifying, responded to the prosecutor's question with what can only be considered an overly specific answer, that he had used the bathroom when he first arrived at Harry O's. When viewed in context, the prosecutor's statement could not have been intended to bolster Rayanoso's credibility. See *State* v. *Swinton*, 268 Conn. 781, 863, 847 A.2d 921 (2004); see also *State* v. *Gibson*, 302 Conn. 653, 662, 31 A.3d 346 (2011). Thus, the defendant's argument is without merit.

2

Referencing Facts Not in Evidence

The defendant next claims that the prosecutor improperly referenced facts not in evidence during closing argument by (1) overstating the certainty of the state's witnesses in identifying the defendant and (2) mischaracterizing the testimony of the state's witnesses with regard to whether the defendant passed an object to Green. The defendant claims that the improper statements made by the prosecutor served to bolster the credibility of the state's witnesses. We disagree.

"Counsel may comment upon facts properly in evidence and upon reasonable inferences to be drawn from them. . . . Counsel may not, however, comment on or suggest an inference from facts not in evidence." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 803, 911 A.2d 1099 (2007). Moreover, "jurors, in deciding cases, are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 365.

a

The defendant claims that the prosecutor made two comments during closing argument and one comment during rebuttal in which she improperly overstated the certainty with which the witnesses identified the defendant. We disagree.

The defendant first alleges that the prosecutor mischaracterized the testimony of McDow during closing argument when she stated: "Mr. McDow, another individual, the gentleman that was working inside the bar, first observed [the defendant] outside on Selleck Street huddled up next to the shooter who he had known from the inside of the bar as the person that got into the argument. He identifies him and tells the police in the beginning that he thinks he would remember what he looked like; that he got a good look at him and he also goes through the same photo array procedure which is done in a way that will insure a fair photo lineup. And he picks out the defendant and he's sure of it at the time, and he picks him out again in court."

The defendant next alleges that the prosecutor mischaracterized all of the identification testimony when she stated during closing argument: "So the identification evidence has been presented to you. All the witnesses testified about the procedure. They testified, they were cross-examined on the procedure and they all were 100 percent sure that this was the same guy who passed the object to the shooter, and was present when the shooting started and fled at the same time as the person that did the shooting, assisting the shooter in taking the gun away from the scene."

Finally, the defendant alleges that the prosecutor mischaracterized witness testimony in her rebuttal argument when she stated: "Identification in this case hadn't been shaken. The evidence in this case shows that these people are sure and it's not just one person. It's not

just two people who are friends. It's three people, and they're all observing the defendant under different circumstances from different perspectives. They all pick him out. They're all 100 percent sure, and [the defendant] admits that Mr. Green followed him to Harry O's that night."

All of the identification witnesses presented by the state unequivocally identified the defendant in court and via photographic arrays. Defense counsel did not elicit any testimony to the contrary on cross-examination. Each of the photographic arrays viewed by McDow, Rayanoso, and Payano were admitted into evidence as full exhibits. At the time he identified the defendant in the photographic array shown to him, McDow wrote on his "Witness Instructions for Photo Identification" form under "Witness comments regarding identification": "The person in photo one is the person the shooter met outside of Harry O's on Selleck [Street]." On his form, Rayanoso wrote in Spanish that the defendant "was the guy who give the gun to the guy who shot my friends outside of the bar." Payano wrote on his form that: "The black male in photo #8 is the black male who was wearing the Yankee cap who was with the black male with dreads who shot me." Additionally, on redirect of Rayanoso, the following colloquy took place:

"[The Prosecutor]: Do you have any doubt at all that the person you picked out of the photo array was the same person that was with the shooter that night?

"[The Witness]: No."

The witnesses were not required to use the exact words "100 percent sure" for the jury to make an inference that the witnesses were certain that they had identified the defendant or for the prosecutor to argue such an inference from the evidence presented. The prosecutor's statements were not improper.

b

The defendant also alleges that the prosecutor made four improper statements mischaracterizing Rayanoso's testimony.[6] Specifically, the defendant takes issue with the use of the phrase "passes an object" by the prosecutor as he claims that Rayanoso never testified that he saw the defendant pass an object to the shooter. The defendant's argument has no merit.

During Rayanoso's testimony, the following colloquy took place:

"[The Prosecutor]: Now when you came back around, can you tell us what you saw?

"[The Witness]: Saw two guys. One, and another was passing something to the other guy. I didn't recognize who it was at the moment.

"[The Prosecutor]: You saw them passing something from one to another?

"[The Witness]: Yeah."

The prosecutor continued her direct examination of Rayanoso:

"[The Prosecutor]: The other person that you saw, had you seen him before that evening?

"[The Witness]: No.

---

[6] The defendant takes issue with four statements by the prosecutor during closing argument. (1) "Now Mr. Rayanoso is the fourth Hispanic gentleman that managed not to get shot that evening, and he saw the defendant pass an object to the shooter over on the Selleck Street area because he was hanging around back there." (2) "[T]hey all were 100 percent sure that this was the same guy who passed the object to the shooter . . . ." (3) "He accompanies him down Vassar. He's passing an object to him." (4) "What are the defendant's actions in this case? To tell you he also was joined in that intent. He meets Mr. Green outside. He's huddled up with him. He passes an object to him."

"[The Prosecutor]: Okay; and were you able to—you said that they were passing an object to each other; is that correct?

"[Defense Counsel]: I'm going to object. I think that mischaracterizes—well I'll withdraw the objection.

"[The Court]: Okay.

"[The Prosecutor]: You saw them passing an object to him?

"[The Witness]: Yes."

Rayanoso testified that he saw the defendant passing an object to Green. The prosecutor's statements in closing argument and rebuttal reiterating that testimony did not mischaracterize the witness' testimony and were not improper.[7]

### 3

### Injecting An Extraneous Issue

Finally, the defendant claims that the prosecutor improperly injected an extraneous issue during her rebuttal argument when she said that witnesses who made in-court identifications "did it through a photo array process that was done in a way to insure that false identifications don't occur." The defendant argues that this statement was improper because photographic arrays are designed to avoid suggestiveness rather than to insure that false identifications do not occur and

---

[7] To the extent that the defendant claims that the prosecutor mischaracterized the testimony of the other eyewitnesses that they were 100 percent sure that the defendant passed an object to Green, the defendant's argument still has no merit. Rayanoso testified that he saw the defendant pass an object to Green. It is undisputed that Green used a gun to shoot the victims. By identifying the defendant as the person who helped Green the night of the shooting, the witnesses were implicitly identifying the defendant as the person who passed the gun to the shooter. The defense claimed that the defendant was not present and thus was not the person who assisted Green on that night, not that a shooting had not occurred.

because the comment was intended to convince the jurors that there was no misidentification of the defendant by the eyewitnesses. Thus, the defendant claims that the statement by the prosecutor amounts to unsworn expert testimony. We agree that the prosecutor's statement during rebuttal argument regarding the photographic array process was akin to unsworn expert testimony.

"A prosecutor . . . may not . . . inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence. . . . A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Internal quotation marks omitted.) *State* v. *Dawes*, 122 Conn. App. 303, 314–15, 999 A.2d 794, cert. denied, 298 Conn. 912, 4 A.3d 834 (2010).

Throughout the trial, the prosecutor elicited testimony in painstaking detail from the identification witnesses regarding the safety measures taken by the police in this case to ensure that the photographic array identifications were not unduly suggestive.[8] These measures included asking the witnesses about their knowledge of the process at the time that they identified the

---

[8] The following colloquy, for example, took place during the direct examination of Payano:

"[The Prosecutor]: And when you went in to look, before you looked at these photographs, did you go over the form that's entitled 'Witness Instructions for Photo Identification'?

"[The Witness]: Yes.

"[The Prosecutor]: And did you or have or did someone read to you what was written on the page?

"[The Witness]: Yes.

"[The Prosecutor]: Did you read it yourself?

"[The Witness]: Yes, I did.

"[The Prosecutor]: And you initialed each line . . . ?

"[The Witness]: Uhm-uhm.

defendant in the photographic arrays, including stressing the fact that photographic arrays are designed to clear the innocent as well as to identify the guilty. In addition to the eyewitness testimony, two police officers testified for the state about their role in showing the witnesses the photographic arrays and the safeguards that they took to insure reliability.

The prosecutor presented ample evidence that the photographic arrays were conducted in a fair and reliable manner, but she did not present evidence to suggest that the photographic arrays were conducted in a manner to insure that false identifications do not occur. Although there is every indication that the jury could have credibly found that no false identification occurred in this case, the prosecutor did not present evidence

"[The Prosecutor]: So you read or were asked that—you were being asked to view a set of photographs?

"[The Witness]: Uhm-uhm.

"[The Prosecutor]: And it's important to clear innocent people as to identify guilt?

"[The Witness]: Yes.

"[The Prosecutor]: Persons in the photos may not look exactly as they did on the date of the incident because features like facial or head hair can change?

"[The Witness]: Uhm-uhm.

"[The Prosecutor]: The person you saw may or may not be in the photograph?

"[The Witness]: Yeah.

"[The Prosecutor]: And the police will continue to investigate the incident whether you identify someone or not?

"[The Witness]: Yes.

"[The Prosecutor]: Okay; and you took a look through the photographs and you picked out a photograph and circled it; is that correct?

"[The Witness]: Yes, I did.

"[The Prosecutor]: Do you recall putting your initials next to the picture?

"[The Witness]: Yes, I did that.

"[The Prosecutor]: And do you recall signing the document?

"[The Witness]: Yes.

"[The Prosecutor]: And you also signed the document and wrote that I just talked to you about you initialed, and then you also signed the bottom?

"[The Witness]: Yes, I did."

The prosecutor engaged in similar colloquies with Rayanoso and McDow.

that the photographic arrays were conducted so as to avoid false identifications altogether. Such evidence would have required expert testimony on the nature of eyewitness identifications and cross-examination of the expert by defense counsel. Because the prosecutor did not present such evidence during the course of the trial, her statement amounted to unsworn testimony and, therefore, was improper.

B

"An appellate court's determination of whether any improper conduct by the prosecutor violated the defendant's right to a fair trial is predicated on the factors established in *State* v. *Williams*, [supra, 204 Conn. 540]. Those factors include [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Miller*, supra, 128 Conn. App. 535–36.

Our Supreme Court has held that "[a]lthough unpreserved claims of prosecutorial conduct are reviewable under *Williams*, it is the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Moreover as the Appellate Court has observed, defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it

or because he or she wants to later refute that argument. . . . Accordingly, we emphasize that counsel's failure to object at trial, while not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . . Put differently . . . prosecutorial misconduct claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 280 Conn. 799–800.

Because we have determined that only one of the prosecutor's statements was improper, we confine our analysis of the *Williams* factors to that statement alone. That statement was: "[T]hey did it through a photo array process that was done in a way to insure that false identifications don't occur." Defense counsel did not object to this statement at trial.

First, we examine whether the comment was invited by defense counsel. In his closing argument, defense counsel specifically attacked the photographic array process and the police investigation of the crime when he stated: "[The defendant] over there, he's still keeping it real. He gives his name and gives his date of birth. They run checks later on. They drop his picture. No one else there is dropping his picture into a photo array. There's your police investigation, a guy with a blue Yankee hat and dreads. Let's drop his picture in a photo array. No sense in doing anything else." In so stating, defense counsel invited the prosecutor to respond to his attack on the police methods of arranging photographic arrays. The prosecutor's statement was responding directly to defense counsel's attack and, therefore, the comment was invited by defense counsel.

We next examine the severity of the prosecutor's impropriety in making the statement. As noted previously, the prosecutor was painstaking in questioning the eyewitnesses and the police officers during direct and redirect examination regarding the fairness and reliability of the photographic array process as conducted by the police in this case. The photographic arrays and witness instructions were entered into evidence without objection and defense counsel did not object to the prosecutor's statement during rebuttal. "In State v. Thompson, 266 Conn. 440, 479, 832 A.2d 626 (2003), our Supreme Court observed that in determining whether a comment was severe, we consider it highly significant that defense counsel failed to object to any of the improper remarks . . . ." (Internal quotation marks omitted.) State v. Miller, supra, 128 Conn. App. 536 n.3.

Though the defense theory was based on misidentification, making the content of the prosecutor's comment central to the critical issue in the case, the statement was made only once. See id., 536. Additionally, the court's instructions to the jury comprehensively covered eyewitness identifications and stressed that if there was any reasonable doubt as to the identity of the defendant, the jury would have no choice but to find the defendant not guilty.[9] The defendant did not

[9] The court's jury instructions provided in relevant part: "In reaching your verdict, you should consider all the testimony and exhibits admitted into evidence. Certain things are not evidence and you must not consider them in deciding what the facts are. These include arguments and statements by lawyers. The lawyers are not witnesses. What they have said in their closing arguments is intended to help you interpret the evidence but it is not evidence. If the facts, as you remember them, differ from the way the lawyers have stated them, your memory of them controls.

* * *

"In this case, the state has presented evidence that an eyewitness identified the defendant in connection with the crime charged. Identification is a question of fact for you to decide, taking into consideration all the evidence that you have seen and heard in the course of the trial.

"The identification of the defendant by a single witness as the one involved in the commission of a crime is in and of itself [sufficient] to justify a

conviction, provided you are satisfied of the identity of the defendant as the one who committed the crime.

"In arriving at a determination as to the matter of identification, you should consider all the facts and circumstances that existed at the time of the observation of the perpetrator by each witness. In this regard, the reliability of each witness is of paramount importance since identification testimony is the expression of belief or impression by the witness.

"His value depends on the opportunity and ability of the witness to observe the perpetrator at the time of the event and to make an accurate identification later. It is for you to consider or for you to decide how much weight to place upon such testimony.

"In appraising the identification of the defendant as the perpetrator by any witness, you should take into account whether the witness had an adequate opportunity and ability to observe the perpetrator on the date in question.

"This will be affected by such considerations as the length of time available to make the observation, the distance between the witness and the perpetrator . . . [t]he lighting conditions at the time of the offense, whether the witness had known or seen the person in the past; the history of anything between them, including any degree of animosity or whether anything distracted attention of the witness during the incident.

"You should also consider the witness' physical and emotional condition at the time of the incident and the witness' powers of observation in general.

"Furthermore, you should consider the length of time that elapsed between the occurrence of the crime and the identification of the defendant by the witness.

"You may also consider the strength of the identification including the witness' degree of certainty. Certainty, however, does not mean accuracy.

"You should also take into account circumstances under which the witness first viewed and identified the defendant; the suggestibility, if any, of the procedure used in that viewing; any physical descriptions that the witness may have given to the police and all the other factors which you find relating to reliability or lack of reliability of the identification of the defendant.

"You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from presentation of the defendant alone to the witness.

"You may consider whether the witness, at any time, either failed to identify the defendant or made an identification that was inconsistent with the identification testified to at trial.

"You will subject the testimony of any identification witness to the same standard of credibility that apply to all witnesses.

"When assessing the credibility of the testimony as it relates to the issue of identification, keep in mind that it is not sufficient that witnesses be freed from doubt as to the correctness of identification of the defendant.

"Rather, you must be satisfied beyond a reasonable doubt of the accuracy of identification of the defendant before you find him guilty of any charge. In short, you must consider the totality of the circumstances affecting the identification.

ask for a curative instruction; however, the court gave a comprehensive instruction on eyewitness identification in its final charge to the jury. See *State* v. *Ancona*, 270 Conn. 568, 616–17, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005). "[T]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) Id., 616.

Finally, we examine the strength of the state's case. The state presented three eyewitnesses who identified the defendant as the person who had helped Green the night of the shooting. The state also presented a letter written by the defendant to his sister attempting to establish an alibi, which was offered to show his consciousness of guilt. The state established that the defendant was acquainted with Green, and the defendant admitted to the police that he had received two phone calls from Green on the evening of the shooting. Although the defendant denied heeding Green's request for the defendant to join him at Harry O's, the state's case was strong.

"When raising prosecutorial [impropriety] claims, the burden is on the defendant to show that the prosecutor's remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted . . . and in the case of unpreserved claims, to show that they were blatantly egregious. . . . Although certain remarks made by the prosecutor, from hindsight, may be deemed imprudent, such isolated and brief episodes as occurred here fail to implicate the denial of the

---

"Remember, the state has the burden not only to prove every element of the crime but also the identity of the defendant as the perpetrator of the crime.

"You must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime or you must find the defendant not guilty. If you have reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty."

defendant's constitutional right to due process." (Citations omitted; internal quotation marks omitted.) *State v. Jarrett*, 82 Conn. App. 489, 504–505, 845 A.2d 476, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004). The defendant, here, has failed to meet his burden of showing that the prosecutor's one improper remark resulted in a denial of due process. Accordingly, we conclude that the defendant was not deprived of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.