STATE OF CONNECTICUT *v.* MATTHEW BOUTILIER
(AC 32207)

Robinson, Bear and Dupont, Js.

494

Argued October 20, 2011—officially released February 14, 2012

*Jodi Zils Gagne*, special public defender, for the appellant (defendant).

*Raheem L. Mullins*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anne Mahoney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, Matthew Boutilier, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of

General Statutes § 53a-59 (a) (5) and criminal posses-
sion of a firearm in violation of General Statutes § 53a-
217 (a) (1). On appeal, the defendant claims that (1)
the trial court's denial of two motions, which requested
the court to "direct the [commissioner of the depart-
ment of correction] to deliver the defendant into the
supervised custody of his attorney," violated the defen-
dant's constitutional rights, (2) the trial court abused
its discretion in denying the defendant's motion to allow
the jury to view the crime scene and (3) prosecutorial
impropriety deprived the defendant of his right to a fair
trial. We affirm the judgment of the trial court.

The following evidence was elicited at trial. In Janu-
ary, 2008, the defendant and his girlfriend, Katie Krantz,
lived together in a house in Hartford. On the evening
of January 11, 2008, Krantz and her friends, Becky
Ramos and Yajaira Aponte, went to the home of a neigh-
bor where the women drank alcohol. Ramos and Krantz
also smoked marijuana and took ecstasy pills. At
approximately 1 a.m., after returning home from a bar,
the defendant went to the neighbor's house to retrieve
Krantz. Krantz invited Ramos and Aponte to come to
the house she shared with the defendant and their three
children, who were not at home that night. Ramos and
Aponte arrived at the house, and, subsequently, the
three women decided to go out to purchase snacks and
cigars. Krantz and Ramos intended to hollow out the
cigars and fill them with marijuana so that they could
continue to smoke marijuana. Krantz told the defendant
of their plans to go out to purchase the cigars, and the
defendant became angry, telling Krantz that he did not
want her to leave the house. The defendant yelled at
Krantz and said that, if she left the house, she should
not come back. Krantz left with Ramos and Aponte,
leaving her keys to the house on a table.

As the three women walked away from the house,
the defendant threw some of Krantz' clothes outside

onto the driveway. Ramos returned to the house to confront the defendant for his behavior. The defendant, who had gone inside and locked the door, unlocked the door and let Ramos into the house. Ramos and the defendant began arguing. Krantz and Aponte returned to the house and went inside. The argument between Ramos and the defendant became physical, and the two struggled in the kitchen in front of a door that led to a basement staircase. The defendant retrieved a .357 caliber revolver from a nearby shelf and shot Ramos in the head, killing her. Aponte ran across the kitchen, toward a telephone on the wall, and the defendant shot her in the chest. Aponte tried to escape through the back door of the house but, finding it locked, ran back toward the kitchen. The defendant met Aponte in the hallway and shot her a second time, at close range. Aponte survived her injuries. At trial, the defendant admitted to shooting Ramos and Aponte, but claimed that he believed they were going to harm him and that he had acted in self-defense.

The defendant was found guilty by a jury of one count of assault in the first degree in violation of § 53a-59 (a) (5) and one count of criminal possession of a firearm in violation of § 53a-217 (a) (1),[1] and was sentenced to a total effective term of twenty-seven years of incarceration. This appeal followed. Additional facts will be set forth as they become necessary.

I

MOTIONS FOR RELEASE FROM CUSTODY

The first portion of the defendant's appeal concerns the court's denial of two motions requesting the defendant's temporary release from the custody of the department of correction so that he could (1) visit the crime

[1] The defendant also was charged with one count of murder in violation of General Statutes § 53a-54a (a) and one count of attempt to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-49 (a) (2). The jury was unable to reach a unanimous verdict as to the murder and attempted murder charges, and the court declared a mistrial as to those charges. The

scene with his attorney and (2) participate in a mock jury preparation session. The defendant claims that the court's denial of these motions violated his constitutional rights.[2] We affirm the judgment of the court.

The following additional facts are relevant to our resolution of the defendant's claim. The defendant was held on a $2 million bond following his arrest. Thereafter, he remained in the custody of the department of correction. On August 31, 2009, the defendant made two oral motions to the court. The first motion sought permission for his temporary release from the custody of the department of correction into the supervised custody of defense counsel so that the defendant could visit the crime scene with his attorney. The second motion sought the defendant's temporary release for the purpose of attending a mock jury preparation session to be arranged and orchestrated by his attorney. The court reserved judgment on the motions, instructing the defendant to submit them in writing. On September 9, 2009, prior to the start of trial, the defendant filed a "Motion for Nontestimonial Evidence" wherein he moved the court to "direct the [commissioner of the department of correction] to deliver the defendant into the supervised custody of his attorney" so that he could "assist his attorney in his defense by inspecting and photographing the premises of the alleged crime . . . ." On September 10, 2009, the court denied both of

defendant's subsequent conviction of manslaughter in the first degree in violation of General Statutes § 53a-55, following a retrial for the shooting death of Ramos, has been appealed by the defendant to our Supreme Court. At oral argument, the defendant stated that the present appeal concerns only the assault and criminal possession of a firearm conviction.

[2] The defendant brought his motions before the trial court in the form of a "Motion for Nontestimonial Evidence," which requested the defendant's temporary release from the custody of the department of correction "pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, Article First, § 8 of the Connecticut Constitution, and Practice Book §§ 40-32 [through 40-38]." On appeal, the defendant makes no argument with respect to the state constitution.

the defendant's motions. The court noted that defense counsel, "by way of oral amendment," had incorporated the defendant's request to attend the mock jury preparation session into the defendant's written "Motion for Nontestimonial Evidence."

On appeal, the defendant claims that the court's ruling violated his sixth amendment rights to the effective assistance of counsel, to present a defense and to confront witnesses against him. The defendant argues that his claim presents a mixed question of law and fact and that our review should therefore be plenary. The state urges us to review the trial court's decision under the abuse of discretion standard.

It is axiomatic that, as an appellate court, the function performed by the trial court in issuing its ruling will dictate the scope of our review. *State* v. *Saucier*, 283 Conn. 207, 219, 926 A.2d 633 (2007) (en banc). The scope of appellate review depends on a proper characterization of rulings made by the trial court. If the court has made findings of fact, appellate review concerns whether those findings were clearly erroneous. If the court has made conclusions of law, our review is plenary, and we must decide whether those conclusions are legally and logically correct and supported by the facts in the record. *Beneduci* v. *Valadares*, 73 Conn. App. 795, 801, 812 A.2d 41 (2002). The trial court in the present case never reached the question of whether a denial of the defendant's motions would effectuate a violation of his constitutional rights, but based its denial on security concerns attendant to his release from custody.

The "Motion for Nontestimonial Evidence" at issue is not the usual motion for evidence made by a party to litigation to view premises involved therein. Rather, it is a motion made by an incarcerated defendant to

temporarily be released from the custody of the department of correction in order to view a crime scene with his attorney and participate in a mock jury preparation session while in the supervised custody of his attorney, without the existence of any pertinent rule or regulation of the department of correction governing the situation.[3]

The defendant argues that the court's denial of his motions effectuated a violation of his constitutional rights. However, he has failed to identify any constitutionally protected right directly implicated by the court's ruling.[4] In its oral decision, the court did not

---

[3] We note that the defendant's written motion for temporary release from the custody of the department of correction made pursuant to Practice Book §§ 40-32 through 40-38, is labeled by him as a motion for "Nontestimonial Evidence." Section 40-38 states, in relevant part: "Upon motion of a defendant who has been arrested . . . the judicial authority by order may direct the prosecuting authority to arrange for the defendant's participation in one or more of the procedures specified in Sections 40-32 through 40-39, if the judicial authority finds that the evidence sought could contribute to an adequate defense. . . ." The forms of participation requested by the defendant—to visit the crime scene with his attorney and to participate in a mock jury preparation session—do not, however, comport with any of the procedures for obtaining nontestimonial evidence set forth in §§ 40-32 through 40-39, nor does the defendant direct our attention to any particular procedure therein.

[4] The defendant claims that the court's ruling impliedly violated his rights to effective assistance of counsel, to present a defense and to confront witnesses against him. However, he has failed to articulate the manner in which the court's denial of his motions for a temporary release from the custody of the department of correction violated those rights as guaranteed by the sixth amendment to the United States constitution. When the court denied the defendant's motions, the defendant was incarcerated due to his failure or inability to post bail. A defendant's lawful incarceration necessarily results in the restriction of liberty and "the necessary withdrawal or limitation of many privileges and rights . . . ." (Internal quotation marks omitted.) *Bell* v. *Wolfish*, 441 U.S. 520, 546, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); see also id., 533–34; id., 546 ("This principle applies equally to pretrial detainees and convicted prisoners. A [pretrial] detainee simply does not possess the full range of freedoms of an unincarcerated individual."). The defendant made no challenge to the amount or conditions of his bail, nor did he move for a modification. The defendant's claim is not, therefore, reviewable by a petition for review pursuant to General Statutes § 54-63g.

discuss or conclude that any constitutional right or rights of the defendant were involved in its denial of his motions. Furthermore, the defendant has not challenged any regulation of the department of correction as being unconstitutional. The defendant argues that his claim on appeal raises an issue of first impression before the appellate courts of Connecticut. He maintains that his claim is analogous "to the arguments made in many habeas cases . . . that prison officials are impeding on prisoners' constitutional rights under the guise of safety concerns" and cites *Turner* v. *Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), in support of his argument. *Turner* is not analogous to the present case, nor does it control our resolution of the defendant's claim. In contrast to *Turner*, the defendant's appeal does not involve a challenge to any rulings, regulations or procedure set forth by the department of correction. Indeed, the department of correction's view, if any, on the defendant's motions for temporary release from its custody was not made known to the court.

The court did not review any regulation or statute in denying the defendant's motions, and no argument was made to the court citing any regulation or statute. The court did not draw any conclusions of law requiring a plenary review; see *Doe* v. *Roe*, 246 Conn. 652, 660, 717 A.2d 706 (1998); and we do not conclude that the denial of the defendant's motions interfered with a basic constitutional right. There is no legal conclusion of the court at issue. Accordingly, there exists no "mixed question of law and fact" to be reviewed on appeal. If an incarcerated individual had been accused of committing

The court's decision to deny the defendant's motions for temporary release from custody imposed no new or additional restrictions on him. Furthermore, the denial of his motions cannot convert the defendant's appellate arguments into a claim that the amount or conditions of his bail were unconstitutional. See *State* v. *Payne*, 121 Conn. App. 308, 314–15 and 315 n.3, 996 A.2d 302, cert. denied, 297 Conn. 919, 996 A.2d 1193 (2010).

a crime in subzero weather, his inability to replicate the condition of temperature, via a desired visit to the North Pole in January, could not change a motion for such a visit into a constitutional claim. Without a direct link to a constitutional right, a defendant's claim is not transformed into a right of constitutional magnitude. *In re Lukas K.*, 120 Conn. App. 465, 472, 992 A.2d 1142 (2010), aff'd, 300 Conn. 463, 14 A.3d 990 (2011); see also *State* v. *Claudio C.*, 125 Conn. App. 588, 598, 11 A.3d 1086 (2010) ("[t]he defendant can not raise a constitutional claim by attaching a constitutional label to a purely evidentiary claim or by asserting merely that a strained connection exists between the evidentiary claim and a fundamental constitutional right" [internal quotation marks omitted]), cert. denied, 300 Conn. 910, 12 A.3d 1005 (2011).

The function of the trial court in this case was to determine whether the defendant's temporary release from the custody of the department of correction was warranted, absent any rule or regulation of the department of correction, or statute or Practice Book section governing release for the purpose of allowing an incarcerated defendant to prepare a defense with the help of a mock jury or a visit to the crime scene. The trial court in this case made no ultimate constitutional conclusion, basing its denial of the defendant's motions on security, rather than an analysis of any rule, regulation or statute. We conclude that the *function* performed by the court was a discretionary matter and should, therefore, be reviewed under the abuse of discretion standard. *State* v. *Saucier*, supra, 283 Conn. 219.

"In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 703, 911 A.2d 1055 (2006). "In determining

whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 186, 842 A.2d 567 (2004).

In the present case, the court heard argument that addressed the severity of the crimes charged against the defendant, the risk of flight by the defendant and the logistical difficulties attendant to transporting and supervising the defendant if he were temporarily released from custody. The court also considered the fact that the defendant grew up in the home where the shootings took place, lived there at the time of the shootings, and was intimately familiar with the physical characteristics of the crime scene and the neighborhood, and that the defendant's attorney had ongoing access to the crime scene.

The court explained that its decision to deny the defendant's motions was made on the basis of numerous security concerns, stating: "[T]his boils down . . . to an issue of security. . . . Based on defense counsel's own rendition of the allegations, the defense does not contest that the defendant was armed with a deadly weapon and caused the death of Ms. Ramos and caused injury to Ms. Aponte by the discharge of a firearm, and it's notable that the defendant was a convicted felon at the time. . . . The nature of the charges are such, combined with the defendant's criminal history, that the primary concern of this court is one of security. The court can contemplate a number of scenarios that would amount to a breach of security that are reasonably foreseeable in the event the court accedes [to] the defense request." We conclude that the court did not abuse its discretion in denying the defendant's motions

requesting temporary release from the custody of the department of correction.[5]

## II

### MOTION FOR JURY TO VIEW THE CRIME SCENE

The defendant's next claim on appeal is that the court abused its discretion in denying his motion to allow the jury to view the crime scene.[6] The defendant argues that it was necessary for the jury to view the crime scene to understand his claim of self-defense; specifically, that he feared for his life as he was attacked by Ramos and Aponte in the small kitchen. We are not persuaded.

"Pursuant to Practice Book [§ 42-6],[7] a trial court may permit a viewing of the scene of the crime if it is of the opinion that a viewing would be helpful to the jury in determining some material factual issue in the case. . . . The determination as to whether to permit the jury to view the scene of a crime is within the sound discretion of the trial court. . . . Thus, unless the action of the trial court in denying the motion constitutes an abuse of discretion, the decision of the trial court must stand. . . . In deciding a motion to view the scene [t]he court should consider whether viewing the scene is necessary or important so that the jury may clearly understand the issues and properly apply the evidence. . . . Although discretionary, the power

---

[5] As noted in part II of this opinion, the defendant resided in the home in which the crimes took place, and the defendant and his lawyer had access to drawings and photographs of the crime scene, obviating the need to actually go to the scene together in order to prepare a defense.

[6] During trial, the defendant made an oral motion for the jury to be allowed to view the crime scene, which was denied by the court.

[7] Practice Book § 42-6, "View by Jury of Place or Thing Involved in Case," provides in relevant part: "When the judicial authority is of the opinion that a viewing by the jury of the place where the offense being tried was committed . . . will be helpful to the jury in determining any material factual issue, it may in its discretion . . . order that the jury be conducted to such place . . . ."

to authorize a view of the scene should be invoked only after the court is satisfied that the present conditions at the site are the same as those that existed on the date of the underlying incident, and that such a personal inspection is fair to both parties and reasonably necessary to do justice." (Citations omitted; internal quotation marks omitted.) *State* v. *Cintron*, 39 Conn. App. 110, 116, 665 A.2d 95 (1995).

In the present case, the jury had access to photographs of the crime scene and a dimensional drawing of the kitchen where the first two shootings took place. The jury heard testimony by the defendant, Krantz and Aponte, during which they described the physical characteristics of the kitchen. The court found that there was nothing "so unique about the premises that it would require a viewing." Given the instructional exhibits and witness testimony on the size and layout of the kitchen, we cannot conclude that a view of the crime scene was necessary for the jury to understand the defendant's claim of self-defense or for it to properly apply the evidence. Accordingly, we conclude that the court did not abuse its discretion when it denied the defendant's motion to allow the jury to view the crime scene.

## III

### PROSECUTORIAL IMPROPRIETY

The defendant's final claim on appeal is that the court improperly denied his motions for a mistrial on the ground of prosecutorial impropriety. The defendant claims that the prosecutor improperly made statements that (1) undermined the defendant's credibility and were prejudicial to his defense, (2) appealed to the emotions of the jury and (3) expressed her personal opinion, thereby prejudicing his ability to receive a fair trial. We disagree.

"The standard for review of an action upon a motion for a mistrial is well established. While the remedy of

a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 280 Conn. 702. "In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Gibson*, 302 Conn. 653, 659, 31 A.3d 346 (2011).

In the interest of adjudicating the defendant's claim with facility, we rearticulate and divide the defendant's arguments into two categories: statements that are alleged to be improper because they (1) expressed the prosecutor's personal opinion and (2) appealed unreasonably to the emotions, passions and prejudices of the jury. "We . . . address each [of the defendant's claims] in turn to determine whether the particular conduct was improper before determining whether the impropriety, if any, deprived the defendant of a fair trial." *State* v. *Singh*, 259 Conn. 693, 702, 793 A.2d 226 (2002).

## A
### Personal Opinion

"It is well established that [a] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . It is not, however, improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Gibson*, supra, 302 Conn. 660. "While a prosecutor cannot express his opinion as to the credibility of witnesses, he is permitted to explain that a witness either has or does not have a motive to lie. . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like. . . . [C]ounsel is entitled to considerable leeway in deciding how best to highlight or to underscore the facts, and the reasonable inferences to be drawn therefrom, for which there is adequate support in the record. We therefore never have categorically barred counsel's use of such rhetorical devices . . . as long as there is no reasonable likelihood that the particular device employed will confuse the jury or otherwise prejudice the opposing party." (Citations omitted; internal quotation marks omitted.) *State* v. *Bermudez*, 274 Conn. 581, 590–91, 876 A.2d 1162 (2005); see also *State* v. *Gibson*, supra, 660–61.

The defendant challenges the following statements, made by the prosecutor during her closing argument:

"In order for you to find the defendant guilty, you have to find proven beyond a reasonable doubt with regard to the murder of Becky Ramos that the defendant intended to kill her and that he caused her death. You have the witnesses, both Yajaira Aponte and Katie [Krantz], who told you that the defendant shot [Ramos] in the head. You have the medical examiner's autopsy report [saying] that [Ramos] was shot by a gunshot wound and [that this was] the cause of her death, and you have the testimony of the defendant, himself, that he shot her in the head. Now, [the defendant] says he didn't intend to kill her. *You ask yourselves whether or not it's reasonable to shoot somebody in the head at close range with a gun and ask me to believe that. The state submits that the evidence shows you should not and that you should find the defendant guilty of this [charge] based upon the evidence before you.*" (Emphasis added.)

The defendant argues that the prosecutor thereby expressed her personal opinion that the defendant was not to be believed. We disagree. The challenged statements were made during the prosecutor's initial comments to the jury concerning the standard of proof and the elements of the crimes charged. They are couched in terms of the jurors' obligation to determine, on the basis of the evidence presented at trial, whether they believed the defendant's claims that he had shot Ramos in self-defense and that he did not intend to kill her.[8] It was not improper for the prosecutor to comment on the evidence presented at trial and to argue the inferences that the jurors may, or may not, have drawn therefrom. See *State* v. *Gibson*, supra, 302 Conn. 659.

The defendant next challenges the prosecutor's statement, "[t]hat's what you want this jury to believe," made

[8] The jury did not find the defendant guilty of murder or attempted murder; see footnote 1 of this opinion; it is therefore unlikely that the jury was unduly influenced by the prosecutor's statements.

during her cross-examination of the defendant.[9] The defendant argues that this statement was akin to the prosecutor's vouching to the jury that the defendant was not being truthful. We disagree. A statement identifying the fact that the defendant was testifying to an alternate theory of events does not rise to the level of prosecutorial impropriety.

The defendant next challenges the propriety of the prosecutor's argument that, because the defendant had played pickup basketball games without a referee, he should have been able to defend himself against Ramos and Aponte.[10] During her closing argument, the prosecutor stated: "So, you're going to be asked to look first at what the defendant subjectively believed and then at what an objective or reasonable person would have believed under the circumstances and that's why all the basketball questions because the state submits to you that a guy who plays pickup basketball all the time against bigger and heavier guys wasn't really afraid of either [Ramos] or [Aponte] that night, and he was more capable of avoiding them and not having to use deadly physical force. The defendant did not believe either one of these women was going to injure him or cause great bodily injury or use deadly force against him."

The prosecutor references her cross-examination of the defendant, wherein she questioned his claimed

---

[9] The challenged statement was made during the following colloquy:

"[The Prosecutor]: You wanted [Krantz] to come back in the house. Right?

"[The Defendant]: No. . . .

"[The Prosecutor]: No. You told her you wanted her to stay. Right?

"[The Defendant]: Yes. That was prior to her leaving.

"[The Prosecutor]: Uh-huh. But once she left, you threw her clothes out onto the driveway not to get her attention to come back?

"[The Defendant]: No.

"[The Prosecutor]: *That's what you want this jury to believe.* Now, you were asked . . . ." (Emphasis added.)

[10] The defendant does not provide a citation to the transcript in support of his claim. We assume that his argument is made in reference to the portion of the transcript quoted in this opinion.

belief that he had to defend himself against Ramos and Aponte by using deadly force. We find no impropriety in this argument, which was made during the prosecutor's discussion of the elements of self-defense and relates directly to the state's challenge of the defendant's claims that he had feared for his life and had acted in self-defense when he shot Ramos and Aponte.

Finally, the defendant challenges the propriety of remarks made by the prosecutor during her rebuttal argument. The prosecutor stated: "The defendant never tells [Aponte] to leave [the house] because she's not involved in the argument. There was much made by the defense attorney about [Aponte's] movements after [Ramos] gets shot. [Aponte's] not involved in the argument, she's not asked to leave, she's simply standing by because she's waiting for [Ramos] so that they can all go. *Women sometimes travel in groups. We travel in groups to the bathroom, we travel in groups when we're going someplace, we wait for each other. That's how women behave, isn't it?* Isn't that what your common sense and your life experience tells you? So, [Aponte is] simply waiting for [Ramos]. . . . [Aponte's] saying nothing to the defendant. She's got nothing in her hands. She's not involved at all. [Ramos] gets shot. She reaches toward the phone. She's not going toward the defendant. She's going toward the phone . . . ." (Emphasis added.)

The defendant argues that the prosecutor thereby "vouched for the conduct of the women who were attacking the defendant on the night of the incident, explaining to the jury why they did what they did even though she was not there and has no knowledge of their actions." The defendant argues that the prosecutor "basically told [the jury] that the defendant should not be trusted and explained to [the jury] why the women acted the way they did," which precluded the defendant

from succeeding in his claim of self-defense. We disagree.

"In determining whether [prosecutorial impropriety] has occurred [in the course of closing arguments], the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Gibson*, supra, 302 Conn. 659.

In the present case, the challenged statements were made as the prosecutor set forth the state's theory of the case, which questioned the defendant's version of events. The prosecutor's argument, which included an explanation of where Ramos, Aponte and Krantz were located prior to and at the time of the shootings, was based on the facts in evidence and inferences fairly drawn therefrom. We conclude that there was no reasonable likelihood that these statements confused the jury or otherwise prejudiced the defendant.

B

Appeal to Jury's Emotions

"A prosecutor may not appeal to the emotions, passions and prejudices of the [jury]. . . . When the prosecutor appeals to emotions, he invites the jury to decide

the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant facts [that] are likely to skew that appraisal." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 719. Accordingly, "a prosecutor should avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from [its] duty to decide the case on the evidence." *State* v. *Carr*, 172 Conn. 458, 470, 374 A.2d 1107 (1977). "An appeal to emotions may arise directly, or indirectly from the use of personal and degrading epithets to describe the defendant." *State* v. *Williams*, 204 Conn. 523, 545, 529 A.2d 653 (1987).

The defendant claims that, during closing argument, the prosecutor improperly "tried to argue that the defendant was a jealous control freak who did not want Krantz to leave the house . . . ."[11] The prosecutor stated: "The defendant unlocks that door [to the house] because he wants this argument to come on. He knows where the gun is in the house, and he's luring [Ramos] in because he knows if [Ramos] comes in, [Krantz is] coming in. He'll be able to control [Krantz] once again because he's going to win this argument because he has the ultimate power. He's an individual who feels devalued by the fact that [Krantz] is leaving with other people again and instead of finding some way to up his own personal value he reaches for a weapon, a power tool to control [Krantz]."

We disagree with the defendant's claim of impropriety. The prosecutor was entitled to argue the state's case forcefully, provided that her argument was fair. See *State* v. *Gibson*, supra, 302 Conn. 659. We conclude

[11] The defendant does not provide a citation to the transcript in support of his claim. We assume that his argument is made in reference to the portion of the transcript quoted in this opinion.

that the prosecutor permissibly "was attempting to persuade the jury to draw [an] inference from the circumstantial evidence of intent that [the prosecutor] had just recited, and was not giving improper unsworn testimony or attempting to insinuate that [she] had secret knowledge of the defendant's guilt." Id., 661.

The defendant next challenges the propriety of the prosecutor's statements and tone of voice during her cross-examination of the defendant, and an incident wherein the defendant alleges that the prosecutor "threw down her notebook in disgust at the defendant's answer." The defendant claims that the prosecutor's actions were unduly argumentative and were designed improperly to appeal to the jury's emotions. We disagree.

At trial, the court overruled the defendant's objection to the prosecutor's statements and tone of voice,[12] stating: "I don't see a problem with the ['you claim'] questions or comments [made by the prosecutor], but it's not just the word because I don't disagree with you that any testimony a person gives from the witness stand they want the jury to believe that, but I think there's a tone. I'm going to agree with—it may not be inappropriate under certain circumstances. It may be inappropriate under others, and I think the tone with what was given at least on the one occasion that I picked up on it, was kind of a disbelief that wants to be communicated to the jury. That's my sense. I'm not saying that's your intent. So, I am going to make a

---

[12] Defense counsel argued: "I would ask that the court . . . admonish the state that questions are questions, not opportunities to inject extraneous comments such as, that's what you want this jury to believe, or sneering asides, you claim, you claim, you claim. The state's here to ask questions. . . . She is lacing her questions with, you claim, you claim, you claim. . . . Those are argumentative. They're not questions. . . . You know, when she says, you claim, in a sneering tone of voice . . . ." Defense counsel did not request that any curative instruction be given to the jury, and we note that none was given.

comment that, as far as ['that's what you want the jury to believe'], it's the manner in which it was delivered, I think, that conveys a message that the questioner finds that difficult to believe. And that's the sense that I got— I received from it."

With respect to the incident wherein the prosecutor is claimed to have thrown her notebook down "in disgust at [the defendant's] answers," the court denied the defendant's motion for a mistrial.[13] Apart from the defendant's own argument, there exists nothing in the record to support his claims that the prosecutor threw her notebook, that it made "a thud audible throughout the courtroom" or that the jury saw, heard or was aware that the event alleged had taken place.

We conclude that the record does not support a finding of the claimed improprieties. In so doing, we note that "the trial court was in the best position to assess the possible prejudice, if any, that may have resulted from counsel's comments, and to fashion an appropriate remedy from a range of possible alternatives."

---

[13] The following colloquy took place out of the jury's presence and after the prosecutor had concluded her cross-examination of the defendant:

"[Defense Counsel]: I'll raise, Judge, my second motion for a mistrial. This based on a claim of prosecutorial misconduct. We just endured something. Okay. Cross-examination of sorts that ended with an exclamation point in the form of the state's attorney dramatically throwing her notebook to the table creating a thud audible throughout the courtroom. This combined with her castaway remarks like, that's what you want this jury to believe, may have a place in a bad production of 'Perry Mason,' but it has no place in this courtroom. So, I would move for a mistrial. In the alternative, I would ask that the state . . . be admonished and that the jury be instructed to disregard such stunts."

"The Court: Do you want to be heard?

"[The Prosecutor]: No.

"The Court: All right. I don't think this certainly arises to the level to declaring a mistrial. I have no reason to believe that this gentleman can't get a fair trial, and the court made every effort to guarantee that he's accorded a fair trial. So, the motion is denied. Under the circumstances, I don't think it's necessary for any kind of admonition."

The defendant's allegation is not made nor is it addressed in any other portion of the trial transcript.

*Rizzo Pool Co.* v. *Del Grosso*, 232 Conn. 666, 687, 657 A.2d 1087 (1995). We conclude that the defendant has failed to demonstrate that the court abused its discretion in denying his motions for a mistrial.

## IV

## CONCLUSION

We conclude that the court properly denied the defendant's motions (1) for temporary release from the custody of the department of correction, (2) to allow the jury to view the crime scene and (3) for a mistrial on the ground of prosecutorial impropriety.

The judgment is affirmed.

In this opinion the other judges concurred.