STATE OF CONNECTICUT *v.* MATTHEW BOUTILIER
(AC 34638)

Gruendel, Beach and Alvord, Js.

Argued April 15—officially released August 13, 2013

*Jodi Zils Gagne*, assigned counsel, for the appellant (defendant).

*Melissa Patterson*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anne Mahoney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Matthew Boutilier, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55 (a) (1) and 53a-55a. On appeal, the defendant claims that the trial court abused its discretion in (1) denying his motion to allow the jury to view the crime scene, and (2) denying his motion for a mistrial when the credibility of a witness for the state was bolstered improperly during his testimony before the jury. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In January, 2008, the defendant and his girlfriend, Katie Krantz, lived together with their three children in

a house on Waterford Street in Hartford. At approximately 9:30 p.m. on the evening of January 11, 2008, Krantz and her friends, Becky Ramos and Yajaira Aponte, went to a neighbor's house where they drank beer and wine. While there, Ramos and Krantz each ingested an ecstasy pill and smoked marijuana. Several hours later, the three women left and went to Krantz' house. Shortly after their arrival at approximately 1 a.m., the defendant came into the kitchen area to meet them. The three children were being cared for by Krantz' mother and were not home that evening.

When the women indicated that they were going out again to purchase snacks and cigars,[1] the defendant became angry and told Krantz not to leave the house. He said that if she went out, she had to leave her keys because she would not be able to come back. Krantz left her keys behind and walked out of the house with Ramos and Aponte. They were midway down the driveway when Ramos saw the defendant throwing articles of Krantz' clothing out the front door. Ramos turned around and walked up to the defendant. She told him to pick up the clothing and to stop acting like a child; the defendant told Ramos to mind her own business. They spat at each other and Ramos intentionally spilled her beer on him. At that point, Ramos, followed by Krantz and Aponte, went after the defendant into the kitchen area and the argument between the defendant and Ramos escalated. Ramos, who was five feet, seven inches tall and weighed 125 pounds, pushed the defendant, who was almost six feet tall and weighed more than 200 pounds, away from her and managed to move him slightly backwards. The defendant told Ramos to get out of his house or "something" would happen.

Neither Krantz nor Aponte spoke to Ramos or the defendant during the argument. None of the women

---

[1] There was testimony that the cigars were to be hollowed out and filled with marijuana.

had a weapon. Ramos had only her cell phone in her hand. As the defendant and Ramos stood close to the door in the kitchen that led to the basement stairs, they continued yelling at each other. The defendant then quickly reached back into a cupboard shelf near the basement door and pulled out a gun. Ramos immediately put her hands up and the defendant, standing two feet or less from her, shot Ramos in the head. She immediately dropped to the floor. Aponte immediately reached for the phone on the wall to call for medical assistance. The defendant shot her in the chest. Aponte was able to run from the room, but the defendant caught up to her and fired a second shot that hit her hand. When Krantz threw herself at the defendant, Aponte crawled back to the kitchen. The defendant fled from the house and was in hiding for more than two weeks before turning himself in at the police station on January 28, 2008.

Ramos died from the gunshot wound to her head. Aponte suffered a collapsed lung and a severed finger. Krantz was uninjured. The defendant was arrested and charged with the crimes of murder, attempt to commit murder, assault in the first degree and criminal possession of a firearm. His first trial was held in September, 2009. The jury found the defendant guilty of the crimes of assault in the first degree with respect to Aponte and criminal possession of a firearm.[2] The jury was unable to reach a unanimous verdict as to the murder and attempted murder counts, however, and the court declared a mistrial as to those charges. The defendant appealed from the judgment of conviction, and this court affirmed the judgment in *State* v. *Boutilier*, 133 Conn. App. 493, 36 A.3d 282, cert. denied, 304 Conn. 914, 40 A.3d 785 (2012).

---

[2] The defendant was sentenced to a total effective term of twenty-seven years of incarceration. *State* v. *Boutilier*, 133 Conn. App. 493, 496, 36 A.3d 282, cert. denied, 304 Conn. 914, 40 A.3d 785 (2012).

The defendant was retried for the shooting death of Ramos. The information charged him with murder in violation of General Statutes § 53a-54a (a). At his second trial, the defendant never disputed that he shot Ramos, but he claimed that he had acted in self-defense because he believed that Ramos was "drug crazed." Following a six day trial, the jury returned a verdict finding the defendant guilty of the lesser included offense of manslaughter in the first degree with a firearm in violation of §§ 53a-55 (a) (1) and 53a-55a. The court accepted the verdict and sentenced the defendant to forty years of incarceration, to run concurrently with the sentence he already was serving for his assault on Aponte. This appeal followed.

I

The defendant's first claim is that the court improperly denied his requests to allow the jury to view the crime scene. Specifically, the defendant argues that "[b]ecause self-defense was at issue, it was important for the jury to understand that the kitchen was very cramped when the defendant felt as if he was being attacked by women who were both high and drunk."

The record reflects that defense counsel made three oral requests for the jury to view the crime scene during the trial. The first request was made when Aponte was testifying, and the court instructed defense counsel to renew the request outside of the jury's presence when both counsel could argue the matter. After the jury exited the courtroom, defense counsel renewed his request for a view of the crime scene. The court heard argument from defense counsel and the prosecutor and then denied the motion. The court stated that it did not consider it necessary to view the kitchen at that time, but that defense counsel could renew the motion: "If the context of the trial convinces me that a view is necessary, I'll reconsider it." The court also noted that

there was a diagram of the kitchen with undisputed dimensions and that the defendant intended to show the jury a videotape of the area around the basement stairwell. The court further offered the following suggestion: "If the dimensions of the room become increasingly pertinent, we can tape off agreed upon measurements here in a courtroom for the purposes of the illustration and take photos of them."

Defense counsel made a third request for the jury to view the crime scene on the fourth day of trial, claiming that neither the testimony of the witnesses nor photographs of the kitchen admitted as exhibits could convey "the confines of that kitchen or the steepness of the stairwell." The prosecutor responded that she believed the photographs were sufficient. The court ruled: "I know what the issue is. I think the picture of the stairwell can be conveyed by a witness; we don't need a view."

Practice Book § 42-6 provides in relevant part: "When the judicial authority is of the opinion that a viewing by the jury of the place where the offense being tried was committed, or of any other place or thing involved in the case, will be helpful to the jury in determining any material factual issue, it may in its discretion, at any time before the closing arguments, order that the jury be conducted to such place or location of such thing. . . ." In determining whether to grant a motion to view the scene, "[t]he court should consider whether viewing the scene is necessary or important so that the jury may clearly understand the issues and properly apply the evidence. . . . Although discretionary, the power to authorize a view of the scene should be invoked only after the court is satisfied that the present conditions at the site are the same as those that existed on the date of the underlying incident, and that such a personal inspection is fair to both parties and reasonably necessary to do justice." (Citation omitted; internal

quotation marks omitted.) *State* v. *Oden*, 43 Conn. App. 480, 483, 684 A.2d 1195 (1996), cert. denied, 240 Conn. 905, 688 A.2d 333 (1997).

In the present case, the record discloses that the jury had evidence regarding the size of the kitchen in the form of testimony, a diagram with uncontested dimensions, a videotape and several photographs. The defendant failed to persuade the trial court that a viewing of the kitchen area was necessary or important to an understanding of the proper application of the evidence. Because a ruling on a motion to view the crime scene is within the sound discretion of the trial court, its decision must stand unless we conclude that the trial court abused its discretion. *State* v. *Cato*, 21 Conn. App. 403, 409–410, 574 A.2d 240, cert. denied, 215 Conn. 819, 576 A.2d 547 (1990). Here, the jury had sufficient evidence to allow it to assess the scene of the crime. A firsthand view of the kitchen area would have been cumulative and was neither necessary nor important to understand the issues or the evidence. Accordingly, the court did not abuse its discretion in denying the defendant's motion for a jury view of the scene of the crime.

II

The defendant's next claim is that the trial court abused its discretion when it denied his motion for a mistrial. He argues that the credibility of a witness for the state was bolstered improperly, which prejudiced the defendant's case with respect to his claim of self-defense, thereby depriving the defendant of a fair trial. We disagree.

The following additional facts are necessary to resolve this issue. While incarcerated, the defendant met Fernando Bosque. Bosque claimed that the defendant confided in him about the shootings in January, 2008, and he became a witness for the state during the

defendant's second trial. Prior to Bosque's testimony, the court gave a cautionary instruction relating to the credibility of a jailhouse informant.[3]

When questioned by the prosecutor, Bosque testified that the defendant told him that Ramos got involved in an argument that he was having with his girlfriend. According to Bosque, the defendant said that Ramos had scratched him and that he became angry and shot her. The defendant said that he shot Ramos in the head and that he then shot off Aponte's finger. Bosque testified that the defendant told him that he fled after he shot Ramos and Aponte and that, while he was in hiding, he came up with a story that supported a self-defense claim.

When questioned, Bosque admitted that he had been convicted of multiple felonies and was serving a fifty year prison sentence. He also conceded that he hoped for an early release date in exchange for his testimony. The prosecutor asked Bosque whether he had testified

---

[3] The court gave the following instruction: "Mr. Bosque is a witness who will testify in a moment in this case and he is what is described as an informant. An informant is someone who is currently incarcerated and who claims he obtained information from the defendant regarding the crime in this case and agreed to testify for the state. You must look with particular care of the testimony of an informant and scrutinize it very carefully before you accept it. You should determine the credibility of the witness in light of the—any motive for testifying falsely and inculpating the accused.

"In considering the testimony of this witness, you should consider such things as the extent to which the informant's testimony is confirmed by other evidence, the specificity of that testimony, the extent to which the testimony contains details known only to the perpetrator, the extent to which the details of the testimony could be obtained from a source other than the defendant, the informant's criminal record, any benefits received in exchange for his testimony, whether the informant previously has provided reliable or unreliable information, and the circumstances under which the informant initially provided the information to the authorities, including whether the informant was responding to a request for information.

"Like all other questions of credibility, this is a question for you to decide. The jury decides this based on the evidence presented to you. And I'll read this to you again in the conclusion of the trial with all my other instructions."

as an informant against another defendant in a previous murder trial and whether that testimony related to facts told to him by that defendant. When Bosque answered affirmatively to both questions, the prosecutor asked him whether that other defendant had been convicted. Defense counsel objected to the question, but Bosque answered "yes" before the court ruled on the objection. The court then sustained the defendant's objection.

As soon as the jury exited the courtroom, the defendant moved for a mistrial. After listening to argument by defense counsel and the prosecutor, the court denied the defendant's motion for a mistrial. When the jury returned, the court gave an additional cautionary instruction: "During the direct examination you heard testimony from Mr. Bosque about testifying in another proceeding. You can ignore that. Don't use that to base any conclusions in this trial. There's no way for you to know what happened there, whether he testified truthfully or untruthfully. That's not before you.

"What you should concentrate on is his testimony here and whatever interest he has in his testimony; that's legal language. In plainer language, what does he expect to gain himself by testifying here. That's one of the things that you—one of the factors that you have to weigh in evaluating his testimony. And we'll—I'll give you further instructions at the end of the case." The defendant claims that the prosecutor's question was an attempt to vouch for Bosque's credibility, that Bosque's response was prejudicial to the defendant's claim of self-defense and that the response to the prosecutor's question "rang a bell that could no longer be unrung." For those reasons, the defendant claims that the court's cautionary instruction given after Bosque's response was insufficient to cure the prejudice to his claim of self-defense and that the court should have granted his motion for a mistrial.

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court. . . . Put another way, [o]n appeal, the defendant bears the burden of establishing that there was irreparable prejudice to the defendant's case such that it denied him a fair trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Coltherst*, 87 Conn. App. 93, 99, 864 A.2d 869, cert. denied, 273 Conn. 919, 871 A.2d 371 (2005).

As previously stated, the court gave a curative instruction with respect to Bosque's response shortly after that inadmissible testimony. "It is to be presumed that the jury followed the court's [curative] instructions unless the contrary appears. . . . We have repeatedly acknowledged, in cases tried to a jury, that curative instructions can overcome the erroneous effect of statements that a jury should not have heard. . . . Because curative instructions often remedy the prejudicial impact of inadmissible evidence . . . [w]e have always given great weight to such instructions in assessing claimed errors. . . . Thus, [a] jury is normally presumed to disregard inadmissible evidence brought to

its attention unless there is an overwhelming probability that the jury will not follow the trial court's instructions and a strong likelihood that the inadmissible evidence was devastating to the defendant. . . . Consequently, the burden is on the defendant to establish that, in the context of the proceedings as a whole, the stricken testimony was so prejudicial, notwithstanding the court's curative instructions, that the jury reasonably cannot be presumed to have disregarded it." (Citations omitted; internal quotation marks omitted.) *State* v. *McIntyre*, 250 Conn. 526, 533–34, 737 A.2d 392 (1999).

The trial court expressly told the jury that it was not to consider any of Bosque's testimony with respect to his testifying in a prior proceeding and that there was no way for the jurors to know whether Bosque had testified truthfully or untruthfully at that time. The jury is presumed to have followed the court's curative instruction, and the defendant has not shown that the stricken testimony was so prejudicial that the jury reasonably cannot be presumed to have disregarded that testimony. There is nothing in the record to suggest that the jury disregarded the trial court's instructions to ignore that portion of Bosque's testimony when it was deliberating.[4] We conclude, therefore, that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[4] "Due process seeks to assure a defendant a fair trial, not a perfect one." (Internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 352, 696 A.2d 944 (1997). The defendant received a fair trial.