STATE OF CONNECTICUT *v.* EDWARD M.*
(AC 31196)

DiPentima, C. J., and Alvord and Bear, Js.

engage in a harmless error analysis. See *State* v. *Hamilton*, supra, 228 Conn. 242.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued January 19—officially released May 15, 2012

*Carlos E. Candal,* special public defender, for the appellant (defendant).

*Lisa A. Riggione,* senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy,* state's attorney, and *Anne Mahoney,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Edward M., appeals from the judgment of conviction, rendered after a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), three additional counts of sexual assault in the first degree in violation of § 53a-70 (a) (2) and two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). The defendant claims that (1) the trial court erred by failing to permit him to cross-examine a key state's witness as to her motive and/or bias and by

restricting him from presenting evidence, resulting in an infringement of his constitutional rights, (2) the prosecutor engaged in several instances of impropriety, denying him his constitutional right to a fair trial and (3) alternatively, should this court fail to find a constitutional violation, it should exercise its supervisory authority and reverse the judgment of conviction and remand the case for a new trial. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of the defendant's claims. The defendant is the victim's biological father. The defendant resided with the victim and the victim's mother during a period of time beginning shortly after the victim's birth in 1995 until she became two years old. The defendant's relationship with the victim's mother ended at that time. After their separation, the defendant's relationship with the victim was confined to sporadic visits. Beginning in 2003, however, when the victim was eight years old, she began overnight visitation with the defendant and his girlfriend, AB. Such visitation generally occurred on a biweekly basis.

During this period, the defendant began sexually abusing the victim. Specifically, the defendant engaged in forced oral, vaginal and anal intercourse with the victim on multiple occasions over an eighteen month period. In early 2007, the victim confided in her cousin, AT, that she had been sexually assaulted by the defendant. AT told her mother what the victim had told her, and AT's mother told the defendant's brother. AT's mother and the defendant's brother urged the victim to tell her mother about the assaults, and the victim then revealed the defendant's conduct to her mother.

Shortly after the victim divulged to her mother the defendant's multiple instances of sexual abuse, the victim's mother brought her to the University of Connecticut Health Center, where she was examined by an

emergency room physician. The victim told the physician that she had been sexually abused by the defendant over a period of approximately eighteen months. Neither a pelvic examination nor a "rape kit" examination was performed at that time.

The victim also was referred to the department of children and families and scheduled for an interview with a clinical child interview specialist at the Children's Advocacy Center (center) at Saint Francis Hospital and Medical Center. The victim told her interviewer, Jessica Alejandro, that the instances of sexual abuse began when she was nine or ten years old and ended in 2006. The victim provided a detailed narrative of the abuse to Alejandro. The victim then was referred to a pediatric physician at the center, Nina Livingston, for further examination. Livingston's examination uncovered no physical abnormalities consistent with sexual assault.

The defendant subsequently was arrested and charged in a seven count substitute information with two counts of sexual assault in the first degree in violation of § 53a-70 (a) (2), alleging sexual intercourse with a child under the age of ten, three counts of sexual assault in the first degree, alleging sexual intercourse with a child under the age of thirteen, and two counts of risk of injury to a child in violation of § 53-21 (a) (2). A jury found the defendant guilty on all counts, and a judgment of conviction was rendered in accordance with the jury's verdict. The court sentenced the defendant to a total effective term of fifty years incarceration, thirty-five years of which is mandatory, and fifteen years of special parole. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendant claims that (1) the trial court improperly restricted his cross-examination of the victim's mother and his presentation of evidence

from AB, the defendant's girlfriend, related to the potential motives and biases of the victim's mother, (2) the prosecutor engaged in multiple improprieties, denying him a fair trial and (3) should this court fail to find a constitutional violation, that the court should exercise its supervisory authority and reverse the conviction and remand the case for a new trial. We address the defendant's claims in turn.

I

The defendant first claims that the court improperly restricted his cross-examination of the victim's mother regarding her potential motives or biases. In addition, the defendant claims that the court improperly restricted his presentation of evidence from AB, thereby infringing on his right to present a defense under the state and federal constitutions. We disagree.

The following additional facts are relevant to the defendant's claims. During cross-examination of the victim's mother, defense counsel questioned her regarding her relationship and breakup with the defendant. The victim's mother responded that she did not recall why her relationship with the defendant had ended and that she did not have any problems or disagreements with the defendant. She further testified that she had not been subjected to any domestic violence by the defendant. Defense counsel then sought to question the victim's mother regarding an incident that had occurred on December 25, 2003. The state objected and the jury was excused.

Outside the presence of the jury, defense counsel stated that he sought to introduce evidence of a specific incident in which "[AB] and the defendant had to call the . . . police department on [the victim's mother] to call her—the police to call her and tell her to stop harassing them on the telephone and all sorts of name-calling and threatening to come over and beat up [AB],

which [AB], of course, is going to testify to. But I have a specific . . . police report where this witness had to be admonished by the . . . police department." Defense counsel claimed that he was proffering the evidence to show that "[the relationship of the victim's mother with AB and the defendant] was anything but . . . harmonious," and to illustrate the "animus [of the victim's mother] against the defendant and a basis of why she would lie and why her daughter would lie . . . ." He thus was offering the evidence for its truth. The state objected to the defendant's proffer on grounds of relevance, hearsay and improper foundation. The court asked defense counsel whether he had a copy of the police report to which he had referred or whether the police department had provided any audio recordings. When defense counsel was unable to produce a copy of the report or any independent corroboration of the police records, the court sustained the state's objection.

Later, during direct examination of AB, defense counsel asked AB about her relationship with the victim's mother. The state objected on relevance grounds. Outside the presence of the jury, the court stated, "I thought we covered this before," and asked counsel how "the relationship between these two adult women [is] relevant in this case other than by some kind of backdoor psychology that the [victim's mother] put the [victim] up to it?" In response, defense counsel indicated that he "wasn't going there."

Subsequently, defense counsel asked AB whether "the victim continue[d] to visit you . . . every other weekend?" AB responded, "Not as often. Because I had a situation with [the victim] and her mother where I had to call the cops . . . ." The state objected to AB's answer as nonresponsive, and the court struck the portion of AB's response following the statement, "Not as often." Immediately afterward, defense counsel asked

AB: "Was there some disruption in your relationship between [the victim] and her mother after 2004?" AB responded: "Yes, there was. I had to call the police on . . . ." The state again objected, and the court struck the portion of AB's response following the statement, "Yes, there was."[1]

As a preliminary matter, we agree with the state that the defendant's conduct before the trial court effectively waived his claim regarding AB's testimony. "A defendant in a criminal prosecution may waive one or more of his or her fundamental rights. . . . [A]lthough there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial. . . . As to many decisions pertaining to the conduct of the trial, the defendant is deemed bound by the acts of his lawyer-agent . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 467–68, 10 A.3d 942 (2011). By explicitly stating that he was not proffering any testimony from AB regarding her relationship with the victim's mother, and by failing to challenge any of the court's subsequent rulings related to that issue, the defendant has abandoned his claim on appeal that AB's testimony was improperly restricted on that basis. Moreover, we note that, even in light of the defendant's waiver, the court allowed AB's affirmative response to the question of whether there was a disruption in her relationship with the victim's mother to stand.

The defendant also claims that the court improperly restricted his right to cross-examine the victim's mother. Specifically, the defendant argues that he presented "a theory of defense that [the] bitterness [of the

---

[1] Because the alleged incident occurred on December 25, 2003, mention of it was nonresponsive to the question about some disruption after 2004.

victim's mother] against [the defendant] for his abandonment of them years earlier had led her to poison their daughter's mind to such an extent that she was able to easily manipulate [the victim] to be bitter against [the defendant] and create this horrible allegation." The defendant contends that the court's restriction of inquiry into the motives and biases of the victim's mother against the defendant "was devastating" due to the lack of physical evidence in the present matter. The defendant argues that "had he been permitted to adequately attack [the] credibility [of the victim's mother] . . . [the victim's] testimony would have been seen in a different light." We disagree.

"Our standard of review of a claim that the court improperly limited the cross-examination of a witness is one of abuse of discretion . . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . .

"The court's discretion, however, comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment [to the United States constitution]. . . . [P]reclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . In determining whether such a violation occurred, [w]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Osimanti*, 111 Conn. App. 700, 707–708, 962 A.2d 129 (2008), aff'd, 299 Conn. 1, 6 A.3d 790 (2010).

The defendant was afforded ample opportunity to cross-examine the victim's mother regarding any bias

she may have harbored against the defendant or AB. Furthermore, the record provides that the victim's mother testified, "No," when asked if she had any personal fights with AB. Although the defendant was precluded from asking questions specifically directed at the alleged 2003 incident, the record does not support a conclusion that he was precluded from sufficient inquiry into the bias or animus of the victim's mother toward the defendant or AB.

"[T]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . [T]rial judges retain wide latitude insofar as the [c]onfrontation [c]lause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things . . . prejudice, confusion of the issues . . . or interrogation that is . . . only marginally relevant." (Citation omitted; internal quotation marks omitted.) *State* v. *Lee-Riveras*, 130 Conn. App. 607, 620, 23 A.3d 1269, cert. denied, 302 Conn. 937, 28 A.3d 992 (2011).

The court's limitation of inquiry into the December 25, 2003 alleged incident between the victim's mother and AB was not improper. As the court noted, the relationship between AB and the victim's mother was of only marginal, if any, relevance to the issues underlying the trial. Moreover, the record reveals no evidence supporting the defendant's theory that the victim's mother improperly influenced the victim and the defendant established no foundation in support of that theory at trial.[2]

---

[2] For example, the evidence demonstrated that the victim's mother was not the first person who the victim told about the multiple instances of sexual abuse. The defendant's brother and AT and her mother learned about the sexual abuse prior to the victim's having divulged those events to her mother.

Accordingly, we determine that the defendant was permitted cross-examination of the victim's mother sufficient to expose any potential bias, and, thus, his constitutional right to confrontation was satisfied.

## II

The defendant claims that he was denied his right to a fair trial due to improper comments made by the prosecutor during closing argument.[3] Specifically, the defendant argues that the prosecutor improperly appealed to the emotions of the jury, denigrated the role of counsel, argued facts that were not in evidence and vouched for the credibility of witnesses. We disagree.[4]

---

[3] Additionally, the defendant claims that the prosecutor's "overly aggressive cross-examination of the defendant whereby the prosecutor accused him of lying whenever he didn't want to look bad" was an improper personal attack intended to indirectly bolster the credibility of the state's witnesses. The defendant's argument is relegated to one sentence, devoid of any substantive analysis and without citation to authority. Accordingly, we decline to review this claim. See *Merchant* v. *State Ethics Commission*, 53 Conn. App. 808, 818, 733 A.2d 287 (1999) ("[w]here a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned" [internal quotation marks omitted]).

[4] "Although the defendant has not preserved . . . the claims of [impropriety] that he now raises on appeal, our Supreme Court has held that a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See *State* v. *Warholic*, 278 Conn. 354, 360, 897 A.2d 569 (2006). The consideration of the fairness of the entire trial through the [*State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] factors duplicates, and, thus makes superfluous, a separate application of the *Golding* test. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Jordan*, 132 Conn. App. 817, 827 n.4, 33 A.3d 307, cert. denied, 304 Conn. 909, 39 A.3d 1119 (2012). In this case, the defendant did not object to any of the prosecutor's

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial." (Citations omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

"We begin . . . by considering the relevant standards of prosecutorial conduct. [A]s the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . By reason of his office, he usually exercises great influence upon jurors. . . .

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury. . . . In addition, [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Darryl W.*, 303 Conn. 353, 375–76, 33 A.3d 239 (2012).

remarks that he claims are improper, nor did he seek any curative instructions from the court.

The defendant first claims that the prosecutor improperly referred to the defendant as a "child molester" during rebuttal closing argument.[5] The defendant contends that the statement improperly implied that the defendant was guilty of the crimes charged and, moreover, that labeling him a "child molester" was "wholly inflammatory." Relying on our Supreme Court's decision in *State* v. *Warholic*, 278 Conn. 354, 897 A.2d 569 (2006), the defendant argues that the comments improperly appealed to the jury's emotions. We disagree.

The following additional facts provide relevant context to our analysis of this claim. During cross-examination, Alejandro, the child interview specialist who spoke with the victim, was asked a series of questions by defense counsel concerning "grooming" of sexual abuse victims.[6] Alejandro indicated that there was no evidence

[5] Specifically, the prosecutor stated: "[Defense counsel] talked about the fact that there's no grooming. Well, this defendant doesn't have to groom this child; this is his own child. He didn't need to manipulate her; he had total control over her. Now, you might find the behavior of a child molester to be a risky behavior, having sex with a child and there's someone next door. But, remember, you're not child molesters, you don't think as they do. What a child molester does that might be risky for a normal person is not risky to a child molester because they're in control of their domain. They pick their prey and they pick their setting and they pick their situation, the same way that an embezzler picks—and they work somewhere and they're taking the money out. They know who's looking, they know who's going to be there."

[6] The following colloquy between defense counsel and Alejandro took place:
"Q. Does the term 'grooming' come into play in childhood sexual abuse?
"A. In some cases.
"Q. Okay. And what is grooming?
"A. Grooming can be the way that the alleged perpetrator gets the child to trust them. It can be by them buying them gifts, it could be by them treating them special, paying them special attention, always taking their side when it comes to a parental argument or fight, any kind of special treatment that is shown toward the child.
"Q. Okay. And would it be fair to characterize this particular interview in these particular claims or allegations to not include any grooming suggestion whatsoever?

of grooming in the present case. During redirect examination, the prosecutor questioned Alejandro as to whether victim grooming was more common in scenarios in which the perpetrator was a stranger to the victim, as opposed to when there was a familial relation. Alejandro responded that grooming was more common in the stranger-as-perpetrator scenario.

As a preliminary matter, we note that the *Warholic* decision is distinguishable. In *Warholic*, the prosecutor stated: "The evidence proves that [the defendant] is the child molester that he's accused of being. *They're out there. They're among us.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Warholic,* supra, 278 Conn. 374–75. It is apparent from the emphasis placed on the phrases, "[t]hey're out there," and, "[t]hey're among us," that the crux of the impropriety in *Warholic* was the prosecutor's implication that child molesters pose an imminent threat to the jurors' community, a patent appeal to fear. Also, the defendant in *Warholic* specifically was referred to as a child molester. In the present case, although the prosecutor used the term "child molester," the record does not support that she was attempting to appeal to the jurors' emotions by implying that child molesters are a pervasive threat to their well-being, and she did not call the

"A. Grooming doesn't always happen when it comes to sexual abuse.

"Q. And as I just asked you, did you have any indication of grooming in this particular case?

"A. No.

"Q. Okay. Would it be fair to say, Ms. Alejandro, that in most instances of childhood sexual abuse the perpetrator seeks to maintain control over the victim?

"A. Yes. And a father has a lot of control over their child.

"Q. Okay. And that that control exists beyond the scope or the times of the alleged abuse?

"A. Can you repeat the question?

"Q. Yes. In other words, that the control I'm referring to is not simply the parental control but maintaining control over who the child has access to, who the child speaks with?

"A. Yes."

defendant a child molester. Rather, taken in context, her comments sought to explain a manner in which a hypothetical perpetrator of sexual abuse may operate.[7]

Although the term "child molester" generally may be pejorative, a prosecutor is allowed some rhetorical leeway in rebuttal closing argument. See *State* v. *Kendall*, 123 Conn. App. 625, 636, 2 A.3d 990 ("[i]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument" [internal quotation marks omitted]), cert. denied, 299 Conn. 902, 10 A.3d 521 (2010). Accordingly, we determine that, in the present context, use of the term child molester was not improper.

The defendant further contends that "by arguing to the jury that [the defendant] . . . would lie and wait for his prey and pick his setting and his situation much like an 'embezzler picks' theirs, the remarks not only argued facts not in evidence, but created the image of [the victim] as the 'prey,' thus serving to ignite the passions, prejudices and emotions of the jury against the defendant." The defendant also argues that the prosecutor's remarks improperly appealed to the jury's emotions by "implying that they were not child molesters

---

[7] The following colloquy between the prosecutor and Alejandro took place at trial:

"Q. Okay. And with regard to grooming, is that behavior done to win over a child and to gain access to a child?

"A. Yes.

"Q. Okay. So, is it more frequently seen with strangers than with adults well known to the child or within the child's own family? Do you see more grooming with strangers than you do with somebody who actually knows the child?

"A. Yes.

"Q. Okay. And is that because the outsider or the stranger has to win over the child or lure them in some way?

"A. Yes."

like the defendant and that they should be leery of people like him," improperly attacked the defendant personally by comparing him to an "embezzler," and "argued facts not in evidence because there was absolutely no evidence that [the defendant] had lied and waited for his alleged prey." We are not persuaded.

Although the defendant claims that there was no evidence that the defendant "lied and waited," our review of the transcript reveals that the prosecutor never invoked the idiom "lying in wait" when describing the defendant's conduct. Accordingly, that portion of the defendant's argument is without merit. Moreover, we determine that the prosecutor's use of an analogy comparing a child molester to an embezzler was not improper. The prosecutor argued, essentially, that a parent's relationship to a child who he victimizes is akin to the relationship a trusted employee has with a "victimized" company in an embezzlement scheme. Both are close relationships based on trust. Both involve crimes of opportunity by persons in control of their environment. Under the circumstances, the parallel was an acceptable appeal to the jury's common sense. See *State* v. *Ayuso*, 105 Conn. App. 305, 326, 937 A.2d 1211 ("[r]emarks that are nothing more than a permissible appeal to the jurors' common sense do not constitute prosecutorial [impropriety]" [internal quotation marks omitted]), cert. denied, 286 Conn. 911, 944 A.2d 983 (2008); see also *State* v. *Chasse*, 51 Conn. App. 345, 361, 721 A.2d 1212 (1998) ("[j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion" [internal quotation marks omitted]), cert. denied, 247 Conn. 960, 723 A.2d 816 (1999).

Furthermore, we conclude that the use of the term "prey" was not an improper appeal to the jury's emotions, but, rather, in the context of this case, a permissible rhetorical flourish. See *State* v. *Kendall*, supra, 123 Conn. App. 636.

The defendant next argues that the prosecutor mischaracterized evidence and denigrated the role of defense counsel when she accused him of rehearsing his witnesses.[8] We disagree.

"[A]s the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Boutilier*, 133 Conn. App. 493, 510, 36 A.3d 282 (2012). The state argues that the prosecutor's comment properly was based on AB's evasive answers to questions on cross-examination concerning whether she had discussed the present case with defense counsel. After reviewing the relevant portions of the transcript, we are persuaded by the state's argument.[9] AB did not directly answer the prosecutor's

---

[8] Specifically, the prosecutor stated: "Now, perhaps [defense counsel] rehearses his witnesses, and maybe that's why [AB] kept dodging me about the fact that he had gone out to her home to talk to her and prep her for her testimony." The defendant argues that this statement "not only mischaracterized the evidence because of an absolute lack of testimony to support such an assertion, but worse yet, engaged in an unwarranted and improper personal attack of the defense lawyer's ethics, denigrated his role as defense counsel and called into question the credibility of his legal representation and the defense case as a whole."

[9] The following colloquy between the prosecutor and AB took place at trial:

"Q. Okay. And you met with [the] defense attorney about coming here to testify today?

"A. I knew eventually I would have to come to testify. He called me at work and told me that I need to come and testify.

"Q. Yeah. The question is, is that he met with you in your home to talk to you about your testimony today. Right?

"A. No.

"Q. He never went out to visit you in your home?

"A. He told me that I needed to come and testify.

"Q. Okay. Let me be really clear. Did the defense attorney ever go out to your home to talk to you, yes or no?

questions about defense counsel visiting her home. Therefore, we determine that the prosecutor's comments regarding the alleged coaching of AB by defense counsel were not improper rebuttal.[10]

Additionally, the defendant argues that the prosecutor's remarks characterizing certain defense claims as "sinister" amounted to improper personal attacks on defense counsel.[11] Although the prosecutor could have chosen a more suitable word to characterize the claims, we disagree with the defendant that use of the term sinister was improper under the circumstances.

"In determining whether [prosecutorial impropriety] has occurred [in the course of closing arguments], the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . [I]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal

"A. To tell me that I need to come and testify.

"Q. Right. And he talked to you about your testimony here in court today. Right?

"A. No."

[10] Referring to the victim's testimony, defense counsel stated during closing argument: "These differences, ladies and gentlemen, we respectfully submit to you are indications of deception, of rehearsal and of manipulation of the truth, and, quite frankly, of falsehood."

[11] Specifically, the prosecutor stated: "He talked about [AT] saying that [the victim] turns on the tears. Well, those are actually his words. She did say that she cried a lot, but turns on the tears is a sinister way of saying that. And there are a number of things, innocent things, that happened in this case that the defense wants you to look at sinisterly."

quotation marks omitted.) *State* v. *Boutilier*, supra, 133 Conn. App. 510.

Here, the prosecutor's use of the term "sinister," when taken in context, does not directly attack or denigrate defense counsel or his institutional role. Rather, the prosecutor's use of the term during rebuttal argument in an attempt to rehabilitate the credibility of the victim, which had been attacked during the defendant's closing statement, targeted a theory of defense. See *State* v. *Outing*, 298 Conn. 34, 83, 3 A.3d 1 (2010) ("There is a distinction . . . between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . . Moreover, not every use of rhetorical language is improper." [Internal quotation marks omitted.]), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). Although the prosecutor's choice of words could have been better, we cannot conclude, under the facts presented, that the isolated use of the term "sinister" during rebuttal argument exceeded the generous latitude of legitimate comment we afford counsel in these circumstances.

The defendant further argues that the prosecutor improperly labeled AB a "scammer." The defendant contends that this comment was a direct personal attack on a defense witness and amounted to impropriety. We disagree.

The following additional facts are relevant to this portion of the defendant's claim. During cross-examination of AB, the prosecutor elicited testimony that the defendant had lived with AB in her public housing apartment for a number of years. AB further admitted that she withheld this information from her landlord in order to avoid a rent increase.

"Counsel may comment upon facts properly in evidence and upon reasonable inferences to be drawn from them. . . . Counsel may not, however, comment on

or suggest an inference from facts not in evidence." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 803, 911 A.2d 1099 (2007). Nor may a prosecutor "appeal to the emotions of the jurors by engaging in character assassination and personal attacks against either the defendant or one of his witnesses." *State* v. *Warholic*, supra, 278 Conn. 389.

Here, the prosecutor's isolated reference to AB as a "scammer" was not improper. The prosecutor used the term in the context of her argument concerning AB's credibility, and the basis for the reference was drawn from evidence adduced at trial. See *State* v. *Luster*, 279 Conn. 414, 440, 902 A.2d 636 (2006) (prosecutor may comment on credibility of witness "as long as the comment reflects reasonable inferences from the evidence adduced at trial" [internal quotation marks omitted]). Specifically, the prosecutor tied the term "scammer" to AB's testimony that she had concealed her living arrangements from her landlord in order to avoid a rent increase that would have occurred if she had disclosed to the housing authority that the defendant was living in her apartment.

The defendant next claims that the prosecutor improperly referred to the case as a "credibility contest" during closing argument.[12] Citing our Supreme Court's decision in *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), the defendant argues that the prosecutor's remark "was incorrect and improper because it misled the jury to believe that the defendant actually had a burden of proof in this case where none exists in criminal matters." We are not persuaded.

Here, the prosecutor's comment was not tantamount to the unequivocal statement prohibited in *Singh*. In

_____

[12] Specifically, the prosecutor argued: "This case is what we call in the law something that is a credibility contest. On the one hand you have the state's witnesses, on the other hand you have the defense. There is a complete denial from the defense."

*Singh,* our Supreme Court stated that "closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are . . . improper." *State* v. *Singh,* supra, 259 Conn. 712. In that case, "the [prosecutor's] argument stated, in essence, that the only way the jury could conclude that the defendant had not [committed the charged conduct] was if it determined that five government witnesses had lied." Id., 710.

The prosecutor made no such argument in the present case. Rather, the prosecutor merely argued the unremarkable proposition that the present case, with its lack of physical evidence, necessarily required the jury to carefully weigh the witnesses' credibility; see cf. *State* v. *Angel T.,* 292 Conn. 262, 295, 973 A.2d 1207 (2009); a proposition echoed by the defendant during his closing statement.[13]

We next turn to the defendant's claims that the prosecutor improperly vouched for the credibility of witnesses. "It is well settled that [a] prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses . . . . The prosecutor may, however, argue to the jury that the evidence and the reasonable inferences to be drawn therefrom should lead the jury to a conclusion as to the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera,* 61 Conn. App. 763, 775, 765 A.2d 1240, cert. denied, 256 Conn. 901, 772 A.2d 599 (2001).

The defendant claims that the prosecutor improperly vouched for the testimony of the state's expert witness, Livingston, the physician who examined the victim at

---

[13] Specifically, defense counsel stated: "[P]recisely as my respected colleague has said, this is a case of credibility."

the center.[14] The defendant contends that the prosecutor's statement, asking the jury if it "honestly believe[s] that a doctor who graduated from Harvard Medical School is going to . . . lie to you about things that are scientifically proven," improperly bolstered Livingston's testimony. We disagree.

The following additional facts provide context to the defendant's claim. Livingston testified at trial as a state's witness. During direct examination she noted the absence of any signs of physical trauma presented by the victim. She testified, however, that the lack of physical abnormalities was not inconsistent with most juvenile sexual abuse cases, given the lapse of time between the last incidence of abuse and Livingston's examination of the victim. Livingston further noted medical studies indicating that 94 percent of juvenile females reporting penile/anal and penile/vaginal penetration exhibited no abnormalities during examinations. During his closing statement, the defendant attacked Livingston's credibility, arguing that "[y]ou have to wonder and you're right to wonder about her statistics and about her findings."

Here, the prosecutor's statement tied Livingston's professional credentials directly to her credibility in assessing "things that are scientifically proven," namely, studies concerning the absence of physical abnormalities during the examination of sexually active juvenile females. The prosecutor's remarks responded to argument raised by the defendant during his closing

[14] Referring to Livingston, the prosecutor stated in rebuttal: "[The defendant] impugns her integrity, saying because she works at [the center] that she's going to come in here and slant all of her testimony to you. Do you honestly believe that a doctor who graduated from Harvard Medical School is going to get up on the witness stand and lie to you about things that are scientifically proven? Did you see him contradict her about any of the studies? No, you didn't because what she told you is what's out there in the literature, the best evidence in the field, the most recent evidence in the field."

statement calling into question Livingston's potential motives to falsify or embellish her testimony. Because the prosecutor's statement specifically tied Livingston's academic pedigree, a proper consideration in the assessment of expert witness testimony; see Connecticut Criminal Jury Instructions § 2.5-1 ("testimony [of an expert witness] is entitled to such weight as you find the expert's qualifications in his or her field entitle it to receive, and it must be considered by you, but it is not controlling upon your judgment") available on the Connecticut judicial branch website, http://www.jud.ct.gov/JI/Criminal/part2/2.5-1.htm.; to her interpretation of scientific evidence adduced at trial, we do not conclude that the statement was improper. Moreover, considering her professional reputation, the remarks also evinced Livingston's lack of motivation to fabricate scientific evidence. See, e.g., *State* v. *Burton*, 258 Conn. 153, 170, 778 A.2d 955 (2001) ("the state may properly argue that the witnesses had no apparent motive to lie").

The defendant also claims that the prosecutor improperly vouched for the credibility of Samuel Kelsey, a testifying police officer.[15] Specifically, the defendant claims that the following statement improperly bolstered Kelsey's credibility: "Do you honestly believe that investigator Kelsey is going to make that up? I mean, we don't have Al Capone or Osama bin Laden on trial over here. Do you honestly think a police officer is going to make that up in order to have this

---

[15] Regarding Kelsey, the prosecutor stated: "I called the witnesses who he talked to. Those are the people that I called—were called by the state, and I called him for a specific reason: because [AB] said she never said she was intoxicated, she never said she had beers and went to sleep while [the victim] was sleeping in the next room. And investigator Kelsey wrote in his report that that's what he told her. Do you honestly believe that investigator Kelsey is going to make that up? I mean, we don't have Al Capone or Osama bin Laden on trial over here. Do you honestly think a police officer is going to make that up in order to have this guy convicted?"

guy convicted?" We agree with the defendant that the remark, "Do you honestly think a police officer is going to make that up in order to have this guy convicted?" was improper.[16]

Facially, the prosecutor's questions to the jury concerning whether Kelsey would make up his testimony resemble those directed at Livingston's testimony. Nonetheless, we note a distinction between the two statements. Unlike the comments directed at Livingston's testimony, the prosecutor's question, "[d]o you honestly think a police officer is going to make that up in order to have this guy convicted," was inappropriate for the jury's credibility determination; that is, the prosecutor's question addressing the credibility of police officers generally, in contrast to her question regarding Livingston's individual status as a physician interpreting a scientific study, was not a proper consideration for the jury in weighing the credibility of Kelsey's testimony. Compare Connecticut Criminal Jury Instructions (4th Ed. 2007) § 2.5-1 with § 2.5-4. In light of the policies underlying our criminal jury instructions concerning police testimony; see, e.g., *State* v. *Banks,* 59 Conn. App. 112, 132–35, 755 A.2d 951, cert. denied, 254 Conn. 950, 762 A.2d 904 (2000); *State* v. *Nieves,* 36 Conn. App. 546, 550, 653 A.2d 197, cert. denied, 232 Conn. 916, 655 A.2d 260 (1995); we determine that the aforementioned question about police officers was improper.

The defendant also takes issue with that portion of the aforementioned remarks that compared the defendant to Al Capone and Osama bin Laden. The defendant argues that such comparison improperly appealed to the jury's biases. We disagree.

---

[16] Our model criminal jury instructions provide that a jury should "neither believe nor disbelieve the testimony of a police official just because (he/she) is a police official." Connecticut Criminal Jury Instructions, supra, § 2.5-4. This instruction was part of the charge to the jury in this case.

As noted, it is improper for a prosecutor to appeal to the passions, biases and prejudices of a jury. See *State* v. *Darryl W.*, supra, 303 Conn. 376. On the basis of our review of the record, however, it is clear that the prosecutor's mention of Al Capone and Osama bin Laden did not attempt to draw an improper, prejudicial parallel between those individuals and the defendant. To the contrary, the prosecutor favorably contrasted the defendant with bin Laden and Capone, in an attempt, however misguided, to imply that Kelsey would not be motivated to testify falsely in the present case because the defendant's conduct was not as egregious as that of bin Laden or Capone. Compare *Gonzalez* v. *State*, 115 S.W.3d 278, 285 (Tex. App. 2003) (improper conduct where "the prosecutor's argument effectively asked the jury to punish. appellant as they would punish Osama bin Laden"), review denied, 2004 Tex. Crim. App. LEXIS 414 (Tex. Crim. App. March 3, 2004); see also *State* v. *Fauci*, supra, 282 Conn. 45 (comments complained of reviewed in context of entire trial). Although we determine that the highlighted question about police officers was improper, we determine that the references to bin Laden and Capone, viewed in the context in which they were made, were not improper.

Having identified an instance of prosecutorial impropriety, we must determine whether that impropriety deprived the defendant of a fair trial. "To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . The . . . determination of whether the

defendant was deprived of his right to a fair trial . . . involve[s] the application of the factors set forth by [our Supreme Court] in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)]. As [the court] stated in that case: In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Reynolds*, 118 Conn. App. 278, 291–92, 983 A.2d 874 (2009), cert. denied, 294 Conn. 933, 987 A.2d 1029 (2010).

We have identified one instance of impropriety in the present matter: the question, "[d]o you honestly think a police officer is going to make that up in order to have this guy convicted?" See footnote 15 of this opinion. Even in the absence of physical evidence in this case, however, we determine that the rhetorical question, which was directed at whether a police officer accurately transcribed an allegedly untrue statement by AB, did not implicate a critical issue in the case. Compare *State* v. *Angel T.*, supra, 292 Conn. 264, 290 (prosecutor's comments improper where credibility of defendant was central to case and comments implied jury could infer defendant's guilt from his retention of attorney).

We note that the defendant did not object to the prosecutor's question nor did he request a curative instruction. See *State* v. *Thompson*, 266 Conn. 440, 483–84, 832 A.2d 626 (2003). Moreover, the defendant's claim relates to a single question. The court provided a thorough charge to the jury, including an instruction that

the testimony of a police officer should not be viewed differently from that of a layperson. Viewing the question in the context of the entire trial, including the closing arguments and the jury instructions, we determine that it was of minimal impact.

Although prosecutorial improprieties may take on a heightened significance in a sexual assault matter where, as here, the state's case is devoid of significant physical evidence; *State* v. *Ceballos*, 266 Conn. 364, 416–17, 832 A.2d 14 (2003); we do not conclude that the defendant was deprived of a fair trial in the present case. On the basis of the defendant's failure to object to any of the prosecutor's statements and questions, the statements and arguments made in his own closing argument, the one question we have determined was improper being said in the course of rebuttal, and the mitigating effect of the court's comprehensive instructions to the jury, we determine that the prosecutor's improper question did not prejudice the defendant. Thus, we cannot conclude that the defendant's right to a fair trial was infringed.

### III

Finally, the defendant argues, in the alternative, that if we determine that the prosecutor's improper conduct does not rise to the level of a constitutional violation, we should, nonetheless, exercise our supervisory powers to reverse his conviction and remand the case for a new trial. We decline the defendant's invitation.

Our Supreme Court and this court exercise our supervisory authority sparingly. See *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998) (supervisory powers invoked only in rare circumstance where traditional protections inadequate to ensure fair and just administration of courts). In the context of prosecutorial impropriety, that authority is generally invoked where,

although "not so egregious as to implicate the defendant's . . . right to a fair trial . . . the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . We have cautioned, however, that [s]uch a sanction generally is appropriate . . . only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 405. Under the circumstances presented, we are not convinced that the conduct challenged on appeal justifies invocation of our supervisory authority.

The judgment is affirmed.

In this opinion the other judges concurred.

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the petitioner's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.